Present: Koontz, Kinser, and Lemons, JJ., and Carrico, Russell and Lacy, S.JJ.

RUBIO ARGELIO ANGEL

v.  Record No. 092341

COMMONWEALTH OF VIRGINIA

OPINION BY SENIOR JUSTICE
ELIZABETH B. LACY
JANUARY 13, 2011

FROM THE COURT OF APPEALS OF VIRGINIA

Rubio Argelio Angel was convicted by an Arlington County jury of malicious wounding, Code § 18.2-51, abduction with intent to defile, Code § 18.2-48, two counts of object sexual penetration, Code § 18.2-67.2, and misdemeanor sexual battery, Code § 18.2-67.4, arising out of attacks on two women, S.P. and V.L., on two different dates. He was sentenced to three consecutive life terms and a twenty-year term of imprisonment, plus twelve months in jail. His convictions were affirmed by the Court of Appeals in an unpublished memorandum opinion. Angel v. Commonwealth, Record No. 2044-07-4 (Mar. 24, 2009). For the reasons stated below, we will affirm the judgment of the Court of Appeals.

FACTS

The facts relating to the attacks at issue are as follows. Facts relevant only to specific assignments of error will be addressed in the discussion of those assignments of error.

On Sunday, July 9, 2006, at approximately 6:30 p.m., V.L. was attacked from behind while walking on a bike path in western Arlington County. V.L. testified that her assailant was a male of average build with dark hair who appeared to be Hispanic. The man knocked V.L. to the ground and continued to "punch [her] in the head and kick [her] all over." After several blows to her head, V.L. lost consciousness. The man then dragged V.L. away from the bike path and into the woods. V.L. testified that the next thing she remembered was being unable to open her eyes because they were swollen shut but that she heard a motorbike, and then voices of the people who found her and called for an ambulance.

Adam Radicic and Christina Bishop were walking on the bike path at the time of the attack on V.L. Radicic testified that he and Bishop saw a small, green motorbike "idling" on the right side of the path, which was bordered by a wooded area. Radicic recognized the green motorbike as one he and Bishop had seen a young man pushing across a creek just a few minutes earlier. Radicic testified that he and Bishop continued on their walk past the motorbike and then heard "moans coming from the woods" and "all of a sudden, this guy jets out of the woods, running within an arm's distance of me and does a 90-degree turn" to run back in the direction of the motorbike. Radicic testified that the man was approximately

2

five feet, eight inches tall, slender, "really . . . very, very thin" and was the same man he had seen earlier on the green motorbike.  Radicic identified Angel at trial stating that Angel "match[ed] a lot of the key features" of the man he saw running from the woods.

Radicic also testified that he found V.L. lying on her back in the woods, "completely covered in blood" with a black tank top pushed up around her neck and her shorts and undergarments had been ripped off.  Her legs were positioned apart and Radicic testified that her head was "entirely swollen up" and her "hair was caked with blood."  Once the paramedics arrived, V.L. was transported to Inova Fairfax Hospital.

Nancy Susco, a Sexual Assault Nurse Examiner at Inova Fairfax Hospital, examined V.L. and testified that her hair was "matted with blood, dried blood," and that she "had leaves, dirt [and] twigs all over her."  Susco testified that V.L. had a bloody nose, a laceration to her forehead, her hands were covered in blood, and she had numerous scratches and bruises all over her body.  Susco also testified that V.L. had a tear to the vaginal wall with "a lot of swelling to that area and there was a lot of bleeding" and that "[V.L.] ended up going to the operating room."  Susco also removed a wooden stick, approximately five inches long, from V.L.'s anus.

3

Susco opined that the stick found in V.L.'s anus and the injuries to her vagina were "consistent with forceful penetration."

Detective Sean Carrig, a member of the Special Victim's Unit of the Arlington County Police Department, interviewed V.L. at the hospital. He testified that based upon the information provided to the police by the victim and witnesses, Arlington Police issued a regional broadcast to other jurisdictions regarding details about the crime against V.L. including that the suspect was a young Hispanic male traveling on a green dirt bike.

As a result of the broadcast, Arlington police learned of an attack on S.P. that occurred on June 18, 2006, in South Arlington, within approximately one mile from where V.L. was attacked. The evidence showed that the attack on S.P. was not as severe as the attack on V.L., but the police noted the two cases were related because both attacks occurred on a Sunday evening at approximately 6:30 p.m. and the suspect was a young Hispanic male of medium build who attacked the women from behind as they were walking on paths.

At trial, S.P. testified that on Sunday, June 18, 2006, she was walking her dogs on a path near Thomas Jefferson Middle School in Arlington, and that at approximately 6:00 p.m. she passed a man who appeared to be adjusting his shoe.

4

She testified that a few moments later "someone came up from behind and tried to pull [her] athletic shorts down." S.P. turned, looked at the man and "started swearing" at him and he ran away. She testified that her attacker was a normal height and build, had dark hair, he had dark, "kind of angled eyebrows" and was wearing black shoes and a yellow striped "polo shirt" with a "thin line of navy blue." S.P. testified that she thought the man was of Latin ethnicity.

Detective Carrig testified that he also learned of three other attacks similar to the attacks on V.L. and S.P. from Detective Victor Ignacio of the Alexandria Police Department. Detective Ignacio testified that he had been investigating assaults that occurred in Alexandria on Sunday, July 9, 2006, against K.G. who was attacked at approximately 5:30 p.m. and two other women within the hour. Detective Carrig testified that the attacks on the three women involved a young Hispanic male of medium build who "grabbed" or "slapped" the victims' "butt[s]" from behind and who fled on a lime green motorbike and the attacks occurred within "1.6 miles" of each other.

K.G. testified that she was assaulted just after getting out of her car at her apartment complex in western Alexandria at approximately 5:30 p.m. on Sunday, July 9, 2006. She noticed a green motorbike drive past the back of her car and stop about two spaces down from where she was parked. As K.G.

5

was walking through the parking lot, she saw a person kneeling behind the green motorbike "tinkering with something" and she purposefully "made eye contact with the person." As she started up the steps to her apartment, K.G. felt a two-handed grab from behind that reached "kind of in between [her] legs and up around [her] butt" at which point she turned around to see who it was. K.G. started yelling at the man who ran back to the green motorbike and fled.

Neither the Alexandria Police nor the Arlington Police had a suspect for these attacks until July 26, 2006, when Arlington County Police Detective Rick Rodriguez was in the 800 block of South Glebe Road responding to a call regarding an assault on a female in that area. Detective Rodriguez testified that he was aware of the regional broadcast about the other assaults on women in the vicinity and was "looking for a lime green motorbike." He also testified that he saw Angel working on a lime green motorbike located at 833 South Glebe Road in Arlington County. Detective Rodriguez identified himself to Angel as a police officer and that he was interested in talking with Angel about reports of "something [that] had happened further down the street and [that the police] were looking for some individuals." Angel identified himself to Detective Rodriguez as "Carlos Alberto Zepeda" and provided identification with that name and a birth

6

date of January 2, 1985. Angel allowed Detective Rodriguez to photograph him and the motorbike.

Detective Rodriguez circulated the information and photographs of Angel and the lime green motorbike to the police departments of Arlington County and the City of Alexandria. Detective Ignacio, of the Alexandria Police Department, received the photographs and compiled a "photo spread," including the photograph of Angel, and showed it to K.G. who identified Angel as the man who assaulted her on July 9, 2006. Angel was arrested on July 28, 2006, for the offense of sexual battery against K.G. At the time of his arrest, Angel again identified himself to police as Carlos Zepeda, a 21-year-old male and he presented corresponding identification.

DISCUSSION

In this appeal, Angel raises five assignments of error relating to the denial of his motion to suppress his statements to police, failure to comply with parental notification requirements, the joinder of trials for two separate offenses and admission of certain evidence of other crimes, the denial of a DNA expert, and the denial of his motion for mistrial. In another assignment of error, Angel also asserts, relying on the recent ruling in Graham v. Florida, 560 U.S. ___, 130 S.Ct. 2011 (2010), that his three

7

consecutive life sentences for nonhomicide crimes, without parole, should be vacated because it is cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution.  We consider these issues in order.

I.  Motion to Suppress Statements to Police

In his first assignment of error, Angel argues that the Court of Appeals erred in affirming the trial court's denial of his motion to suppress his custodial interrogation because it violated his constitutional rights against self-incrimination and to the assistance of legal counsel under Miranda v. Arizona, 384 U.S. 436, 471 (1966).

The well-settled principles of federal constitutional law require that a suspect be informed of his constitutional rights to the assistance of counsel and against self-incrimination. Miranda, 384 U.S. at 471.  These Miranda rights may be waived by the suspect if the waiver is made knowingly and intelligently.  Id. at 475.  The Commonwealth bears the burden of showing a knowing and intelligent waiver.  Id.  The determination of whether the waiver was made knowingly and intelligently is a question of fact that will not be set aside on appeal unless plainly wrong.  Jackson v. Commonwealth, 266 Va. 423, 432, 587 S.E.2d 532, 540 (2003).

The evidence in this case shows that Detectives Victor Ignacio and Rosa Ortiz interviewed Angel entirely in Spanish,

8

Angel's native language.  The detectives wore plain clothes and carried no weapons during the interview and they did not raise their voices or resort to any physical violence at any time during the interview.

Throughout the interview, Angel identified himself as Carlos Zepeda, a 21-year-old male.  Angel also provided the police with corresponding identification, which the police later discovered to be false.

The detectives began the interview by obtaining general information from Angel including that he had completed the ninth grade in El Salvador, that he had moved to the United States in February 2006, and that he had full-time employment in construction work.  The detectives ensured that Angel was not hungry or thirsty and that he had not consumed any medications, drugs, or alcohol that day.

After obtaining this background information and observing that Angel's "Spanish was fairly good" and that he had a "good background in terms of his verbal expressions, how he spoke" the detectives advised Angel of his rights.  Detective Ignacio read Angel his Miranda rights in Spanish and also provided Angel with a waiver of rights form written in Spanish.  When asked if he understood his rights as read to him, Angel responded affirmatively.  Angel, at Detective Ignacio's request, read the waiver portion of the form aloud, which

9

provides, as translated in English, "I have read this declaration of my rights and I understand my rights. I am willing to testify and answer the questions. I have not been threatened or made any promises or offers of compensation." Angel stated that he understood what he had read, and before signing the form, said he did not have any questions regarding the form or its contents.

Angel argues that an understanding of rights is not the same as a waiver of those rights. Here, Angel argues that he did not expressly waive his rights and such waiver cannot be inferred either from his signature and statements indicating he understood his rights nor his silence as to waiver. He contends there is a presumption against waiver and, here, the totality of the circumstances – that he was seventeen years old with only a ninth grade education from El Salvador, a foreigner who had been present in this country for only six months, and the absence of a parent, guardian or other interested adult at the interview – does not rebut that presumption. Angel argues that his conduct here was "mere silence" with respect to his rights and it does not constitute a knowing, intelligent, and voluntary waiver.

We agree that a valid waiver will not be presumed simply from the silence of the accused after the warnings are given. Harrison v. Commonwealth, 244 Va. 576, 582, 423 S.E.2d 160,

10

163-4 (1992) (quoting North Carolina v. Butler, 441 U.S. 369, 373 (1979) for the conclusion that, under Miranda, "mere silence is not enough"). However, Miranda neither requires a waiver to be in writing or verbally expressed, nor does it preclude the conclusion that a waiver occurred based on the suspect's course of conduct. Harrison, 244 Va. at 582, 423 S.E.2d at 163 (quoting Butler, 441 U.S. at 373).

The evidence in this case demonstrates that Angel was not silent as to his rights and that he understood and waived those rights. The interview and discussion of rights were conducted in Angel's native language. He indicated verbally that he understood each of his rights when they were read to him and when he read them aloud and affirmatively checked each statement on the form indicating his understanding and signed the form. The form specified that Angel had a right to not talk with the officers or to stop talking with them at any time. Nevertheless, Angel proceeded to talk with the officers about the attacks after he was informed of these rights. The explanation of his rights also included the statements that "I understand my rights" and that "I am willing to testify and answer the questions." Angel's express written and verbal statements of waiver of his rights are strong proof of the validity of his waiver. Id. at 582, 423 S.E.2d at 163.

11

While the officers conducting the interrogation did not know at that time that Angel was a juvenile, the information gathered from him reflected Angel's experience, education, and background for consideration by the trial court in determining whether Angel knowingly, intelligently, and voluntarily waived his rights. Moreover, there is no evidence that Detectives Ignacio and Ortiz obtained Angel's acknowledgement of understanding regarding his rights or signature on the waiver of rights form by duress or coercion.

Based on our review of this evidence, we find that the record supports the trial court's factual finding that Angel waived his Miranda rights and that the waiver was knowing, voluntary, and intelligent. Accordingly, we will affirm that part of the Court of Appeals' judgment sustaining the trial court's denial of Angel's motion to suppress his statements to Detectives Ignacio and Ortiz.

## II. Parental Notification

In his second assignment of error, Angel asserts that the Court of Appeals erred in affirming the circuit court's actions dismissing his appeal of the certification order and denying his motion to dismiss the indictments. Angel's appeal and motion to dismiss were based on his contention that he has a due process right guaranteed under the Fifth and Fourteenth Amendments to the United States Constitution to have his

12

parents notified of juvenile court proceedings affecting him. Because such notification was not given in either his initial advisement hearing or in the transfer hearing, Angel asserts that his constitutional right to due process was violated and the dismissal of his appeal and denial of the motion to dismiss the indictments were error.

The facts relevant to this assignment of error follow. When arrested on July 28, 2006, Angel stated he was 21 years old, but later admitted he was only 17 years of age. He also told the police that his mother was in El Salvador and that she did not have a telephone and that he could not call her. Angel did not know his father or where his father resided. He said he had other relatives but he did not "associate with them" and that "[t]hey didn't know anything about him."

Six petitions were presented to the Arlington County Juvenile and Domestic Relations ("JDR") court at an advisory hearing held on July 31, 2006. Each petition named Angel's mother as Maria E. Angel, and her address as unknown, but in El Salvador. Angel's father and father's address were listed as unknown. In its July 31 order, the JDR court noted that "[N]o parent is available." The JDR court also appointed an attorney and guardian ad litem and ordered that Angel be held in detention pending the transfer hearing which was set for September 6, 2006.

13

Angel, his attorney and his guardian ad litem received written notice and all were present at the transfer hearing on September 6, 2006. At the hearing, the JDR court found probable cause existed to believe Angel committed the aggravated malicious wounding against V.L. and certified that charge along with the five other charges to the grand jury pursuant to Code § 16.1-269.1(B).[1] Angel filed a motion opposing the transfer and certification of the charges and filed a notice of appeal to the Circuit Court of Arlington County citing failure to comply with the notice provisions of Code §§ 16.1-263 and 16.1-269.1 and "the dictates of due process under the Fifth and Fourteenth Amendments."[2]

On September 12, 2006, the Commonwealth filed a motion in the JDR court seeking a clarification of that court's July 31 order. The motion was granted and the JDR court entered an order reciting the elements of the July 31 hearing, specifically, that the Commonwealth proffered that the whereabouts of Angel's father was unknown and his mother lived at an unknown address in El Salvador and that Angel did not object to this proffer. The JDR court then certified that

---

[1] The Commonwealth originally sought certification pursuant to Code § 16.1-269.1(C).

[2] Angel also filed a petition for a Writ of Prohibition with this Court on September 14, 2006, seeking an order preventing the issuance of the indictments. That petition was denied by Order dated September 20, 2006.

"the identity of the defendant's father was not reasonably ascertainable and that the location or mailing address of the defendant's mother was not reasonably ascertainable." The guardian ad litem noted on the order that she could neither object nor agree to the order because she was not present at the July 31 advisory hearing. She also noted that since the advisory hearing she had obtained a telephone number for Angel's mother. There was no indication of an address for the mother.

At a hearing on September 27, 2006, the circuit court denied Angel's appeal finding that Code § 16.1-269.4 precludes an appeal from certifications made pursuant to subsection B of Code § 16.1-269.1, that because an appeal is an appeal de novo, reconsideration of a transfer was not "appropriate," and pursuant to Code § 16.1-269.1(E), an indictment "cures any error or defect in any proceeding held in the juvenile court except with respect to the juvenile's age."

On November 30, 2006, Angel filed a motion to dismiss the indictments issued on September 18, reiterating his due process contention regarding the failure to provide notice to his parents. The circuit court denied Angel's motion to dismiss the indictments at a hearing on December 7, 2006.

We have said, and Angel does not dispute, that the failure to comply with statutory requirements relating to

15

juvenile proceedings including parental notice requirements constitutes procedural error that renders the proceeding voidable.  Nelson v. Warden, 262 Va. 276, 285, 552 S.E.2d 73, 78 (2001).  Angel also agrees that any procedural error is deemed cured by the issuance of an indictment pursuant to Code § 16.1-269.1(E).  Shackleford v. Commonwealth, 262 Va. 196, 205-06, 547 S.E.2d 899, 904-05 (2001).  Angel correctly asserts, however, that this Court has never addressed whether the failure to comply with the statutory parental notification requirement constitutes a denial of due process guaranteed by the Fifth and Fourteenth Amendments.  Thus, the threshold issue in Angel's assignment of error is whether the Fifth and Fourteenth Amendments to the United States Constitution confer on him a due process right to parental notification for his initial advisement hearing and his transfer hearing.[3]

In 1967, this Court considered whether the recently decided United States Supreme Court case of In re Gault, 387 U.S. 1 (1967), required, as a matter of constitutional due process, the provision of an attorney for a juvenile in a transfer hearing. Cradle v. Peyton, 208 Va. 243, 156 S.E.2d 874 (1967).  We concluded that the constitutional safeguards afforded juveniles in Gault were limited by Gault to

---

[3] Angel's assignment of error does not encompass any challenge asserting a constitutional defect in the statutory processes relevant here.

16

proceedings "by which a determination is made as to whether a juvenile is a 'delinquent' as a result of alleged misconduct on his part, with the consequence that he may be committed to a state institution." 387 U.S. at 13. A transfer hearing, which was the proceeding at issue in Cradle, was not the type of hearing that resulted in commitment to a state institution and, accordingly, we concluded that the constitutional protections imposed in Gault did not apply. Cradle, 208 Va. at 246, 156 S.E.2d at 877.

Angel asserts that "Cradle's distinction between adjudicatory and transfer hearings has been undermined since 1967." In support of this statement, Angel refers to the statutory changes in the Code of Virginia relating to juvenile proceedings which now afford a juvenile a right to counsel "prior to the adjudicatory or transfer hearing." Code § 16.1-266(C). There is no question that since Cradle the General Assembly has specifically provided juveniles certain procedural rights. However, those are rights provided by statute, not conferred by the constitution.

Angel does not cite and we find no case in which the United States Supreme Court has established that juveniles have a constitutionally protected due process right of parental notice for non-adjudicatory proceedings. The statements of the Supreme Court relied upon by Angel, that

17

transfer hearings are critically important and that juvenile proceedings must satisfy "the basic requirements of due process and fairness," were made in Kent v. United States, 383 U.S. 541, 553 (1966) and cited in Gault, 387 U.S. at 12. These statements do not make parental notification of an initial advisement hearing or a transfer hearing a due process right. Nevertheless, as indicated above, in this case Angel was represented by counsel at both hearings. A guardian ad litem was appointed in the initial hearing at the request of Angel's attorney because, as proffered by the Commonwealth, Angel's father was unknown and the location information regarding Angel's mother was limited to somewhere in El Salvador. Angel did not dispute the information contained in the Commonwealth's proffer.[4] The guardian ad litem received notice and participated in the transfer hearing. These facts show that the process Angel received is consistent with the Supreme Court's admonition that a juvenile be treated with the "basic requirements of due process and fairness." Kent, 383 U.S. at 553.

For these reasons, Angel's claim that his constitutional due process rights were violated must fail because no such right exists with regard to non-adjudicatory proceedings.

---

[4] These facts were also recited in Angel's Writ of Prohibition filed in this Court.

18

### III. Motion for Appointment of DNA Expert and for a Continuance

Prior to trial, Angel filed a motion seeking funds to employ a DNA expert to review the DNA evidence that the Commonwealth intended to introduce at trial. That evidence consisted of a DNA analysis from blood stains on a shoe recovered from Angel's residence. The analysis showed that the DNA matched the DNA profile of victim V.L. The trial court denied Angel's motion. The trial court also denied Angel's renewed motion to employ a DNA expert as well as his motion, made eleven days before trial, for a continuance to allow Angel to prepare his defense with regard to the DNA evidence.

On appeal, the Court of Appeals assumed without deciding that the failure to grant these motions was error but held that any such error was harmless. Angel, slip op. at 16-18. Angel's third assignment of error asserts that the Court of Appeals' holding was error.

On brief, Angel presents various reasons why the trial court's refusal to grant Angel's motions for a DNA expert and continuance were error. Because the Court of Appeals assumed without deciding that the trial court's action in this regard was error, we need not address these arguments. The issue before this Court is whether the error, if any, was harmless.

19

We have previously held that the Due Process and Equal Protection clauses of the United States Constitution, as interpreted by the United States Supreme Court in Ake v. Oklahoma, 470 U.S. 68 (1985) and Caldwell v. Mississippi, 472 U.S. 320 (1985), require that "the Commonwealth of Virginia, upon request, provide indigent defendants with 'the basic tools of an adequate defense,' and, that in certain instances, these basic tools may include the appointment of non-psychiatric experts." Husske v. Commonwealth, 252 Va. 203, 211, 476 S.E.2d 920, 925 (1996) (quoting Ake, 470 U.S. at 77). We have also held that errors, arising from the denial of a constitutional right are subject to a harmless error analysis. Lilly v. Commonwealth, 258 Va. 548, 551, 523 S.E.2d 208, 209 (1999). When considering whether an error involving a constitutional right can be held harmless, " 'the court must be able to declare a belief that [the error] was harmless beyond a reasonable doubt;' otherwise the conviction under review must be set aside." Id. (quoting Chapman v. California, 386 U.S. 18, 24 (1967)).

Application of this standard requires us to determine whether there is a "reasonable possibility" that the evidence complained of by the defendant "might have contributed to the conviction." Id. (quoting Chapman, 386 U.S. at 23). In reaching such a determination, the Court must consider whether

several factors, including (1) the importance of the tainted evidence in the prosecutor's case, (2) whether that evidence was cumulative, (3) whether there is evidence that corroborates or contradicts the tainted evidence on material points, and (4) the strength of the prosecution's case as a whole.  Id.

Angel argues that the probative value of the DNA evidence presented by the Commonwealth as purportedly linking Angel to V.L. was "very high."  Angel argues that the identifying evidence was "ambiguous and greatly strengthened by the DNA evidence."  The only physical evidence linking Angel to the crime against V.L. was the DNA evidence.  Finally, Angel argues that the evidence of his confession was weak, as it constituted no more than "a serial assent to statements made by the police, concerning events he said took place when he had been drinking heavily."  According to Angel, "[I]t is reasonably possible that the verdict would not have been the same" if a DNA expert had challenged the conclusions regarding the DNA evidence offered by the Commonwealth's witness or the procedures used to analyze the DNA evidence.  Thus, Angel argues if he had been given an expert or the time to prepare even without the expert, some or all of the convictions "could certainly" have been affected.  Therefore, according to Angel, the Commonwealth did not meet its burden in demonstrating that

21

the asserted errors were harmless beyond a reasonable doubt. We disagree.

While the DNA evidence is the only physical evidence that links Angel to V.L., the remaining evidence shows beyond a reasonable doubt that the lack of the DNA evidence would not have altered the verdict. Circumstantial evidence including description of a person fleeing the crime scene using a green motorbike matched the description of the perpetrator of an attack shortly before the attack on V.L. and his mode of escape. The victim of the earlier attack positively identified Angel as the attacker. Furthermore, Angel confessed to the attack on V.L. in a recorded statement, which he signed and he wrote a letter of apology to the victim V.L., which was admitted into evidence. The DNA evidence at issue related only to the question of the perpetrator's identity. Considering the remaining evidence of identity of the perpetrator of the attack on V.L. in light of the factors outlined, we conclude that any error in denying Angel's motion for appointment and compensation of an expert was harmless beyond a reasonable doubt. We reach the same conclusion with regard to the denial of Angel's motion for continuance. That request was based solely on a stated need for additional time to review the DNA evidence. The denial of this motion, if

error, was harmless error based on the remaining evidence of identity recited above.

### IV.  Joinder and Admissibility of Other Crimes Evidence

In his fourth assignment of error, Angel contends that the Court of Appeals erred in holding that the trial court's joinder of the offenses against V.L. and S.P. for trial and the admission of other crimes evidence were harmless error. While Angel spends considerable time discussing why joinder was error, we need not address that issue because the Court of Appeals, as reflected in Angel's assignment of error, assumed without deciding that the joinder was error.  See also Angel, slip op. at 8.  The issue before us with regard to joinder is directed to the Court of Appeals' holding that such joinder, if error, was nevertheless harmless error.

The Court of Appeals concluded that the joinder of separate offenses was harmless error because (1) the evidence of other crimes admitted in the joint trial would have been admissible in each trial had the offenses been tried separately, and (2) assuming without deciding that the evidence relating to the attack on V.L. would not be admissible in a trial of charges relating to the assault of S.P., and that the evidence relating to the assault of S.P. would not be admissible in the trial of charges relating to

23

the attack on V.L., the impact of that evidence in the joint trial was harmless error because the other evidence of Angel's guilt relating to the respective attacks was overwhelming. Id., slip op. at 13-15. We agree.

### A. Admissibility of Other Crimes Evidence

The evidence of other crimes at issue in this case involves sexual assaults against three other women. These three assaults took place on Sunday, July 9, 2006, within one hour of the same time of day as the assault on V.L. The first crime involved an assault on K.G. who testified that a man wearing a bike helmet approached her from behind and touched her between her legs and around her buttocks as she started up the steps to her apartment in western Alexandria. She had observed the man kneeling behind a motorbike with green and red swirls "tinkering with something" just before the attack. The man fled on the motorbike after the assault. K.G. identified Angel as her attacker.

At trial, Detective Ignacio testified as to the two other assaults that also occurred in western Alexandria on July 9 just prior to the assault on V.L. In those instances, the attacker "grabbed" or "slapped" the buttocks of two women. By the time of trial, Angel had pled guilty to sexual battery in all three incidents.

Angel argues that the admission of proof relating to these crimes was improper because the facts of the incidents were not nearly identical to the crimes for which he was on trial in any distinctive aspect, particularly with regard to the attack on V.L., and the admission of these crimes was more prejudicial than probative.

Evidence of other crimes generally is not admissible to show a defendant's propensity to engage in bad acts or crimes. Kirkpatrick v. Commonwealth, 211 Va. 269, 272, 176 S.E.2d 802, 805 (1970). However, there are exceptions to this general rule. Evidence of other crimes is admissible in cases of disputed identity to prove the probability of a common perpetrator if the other crimes bear "sufficient marks of similarity to the crime charged." Turner v. Commonwealth, 259 Va. 645, 651, 529 S.E.2d 787, 791 (2000) (quoting Chichester v. Commonwealth, 248 Va. 311, 327, 448 S.E.2d 638, 649 (1994)). To be admissible, other crimes need not be "virtual carbon copies" of the crime on trial. Spencer v. Commonwealth, 240 Va. 78, 90, 393 S.E.2d 609, 616 (1990). The similarity must be such that the probative value outweighs any prejudicial effect. Id. at 90, 393 S.E.2d at 617.

Applying these principles, we consider whether the other crimes evidence would have been admissible in a separate trial of the charges based on the July 9 attack of V.L. as well as

25

in a separate trial of the charges based on the June 18 attack on S.P.  The other crimes evidence involved three sexual assaults, each of which occurred on July 9 within one hour's time and within one and one-half to three miles of each other.  As noted by the Court of Appeals, the attacks involved a sexual touching of the victims just below the waist from the rear.  The attacker was a male, identified by two victims as young and Hispanic, who fled on a motorbike with green coloring.  The evidence indicated that the attacker traveled by motorbike "in a northeasterly path from Alexandria into Arlington as he committed the series of offenses leading up to his attack on V.L."  Angel, slip op. at 11.  The attack on V.L., although significantly more violent, shared idiosyncratic features with the attacks committed in the other crimes - a sexual attack initiated from the rear; use of a green motorbike by the attacker; and Hispanic appearance.  Additionally, the attacks in the other crimes occurred just prior to the attack on V.L. and all of the attacks, including the attack against V.L., occurred within three miles of each other.

In the trial court Angel contested his identity as the perpetrator of the July 9 attack on V.L.  K.G. positively identified Angel as her attacker and Angel pled guilty to the other two attacks.  Consequently, the other crimes evidence

26

met the criteria of relevance on the issue of identity. Based on this record, we agree with the Court of Appeals that the other crimes evidence would have been admissible in a trial of the charges against Angel based on the July 9 attack against V.L. Angel, slip op. at 10-11.

We also agree with the Court of Appeals that the other crimes evidence would have been admissible in a trial on the charges based on the June 18 attack on S.P. Id., slip op. at 11-12. We have already discussed the similarities between the other crimes evidence. Like those attacks, the June 18 attack on S.P. occurred on a Sunday in the early evening within three miles of the places where the July 9 attacks occurred and the attack against S.P. was executed in the same manner as the attacks described in the other crimes evidence. As the Court of Appeals stated, in these attacks, "the perpetrator said nothing, used his hands to make brief contact with the woman's buttocks or the clothing covering her buttocks, and fled quickly after making the contact that constituted sexual battery." Id., slip op. at 12. Angel, slip op. at 12. Because the evidence of other crimes would have been admissible had the charges against Angel for the attacks on V.L. and S.P. been tried separately, Angel suffered no prejudice from their admission in the single trial of those charges in this case.

## B. Joinder as Harmless Error

The joinder of the two trials also allowed the jury to hear evidence of both the July 9 attack on V.L. and the June 18 attack on S.P. Angel argues that if the cases had not been joined "it is less likely that the subsequent July 9 acts would have been permitted to be heard by the [S.P.] jury." With regard to the impact on the offenses against V.L., Angel asserts that if the jury did not hear the evidence relating to the June 18 attack, it would "think differently" about the issue of intent in connection with the July 9 attack because the only criminal history revealed would be a series of assaults in a short time frame on a single afternoon, rather than a man who also had performed the same act a month earlier. For these reasons, Angel says the joinder of the two trials was not harmless error.

A non-constitutional error is harmless if it plainly appears from the record that the parties had "a fair trial on the merits and substantial justice has been reached." Code § 8.01-678. If other evidence of guilt is so overwhelming and the error insignificant, by comparison, supporting a conclusion that the error did not have a substantial effect on the verdict, the error is harmless. United States v. Lane, 474 U.S. 438, 450 (1986).

In concluding that the joinder was harmless error, the Court of Appeals assumed without deciding that the evidence of crimes against V.L. would not have been admitted in a separate trial involving the offense against S.P. Angel, slip op. at 15. With regard to the offense against S.P., Angel challenged only the evidence identifying him as the perpetrator. The admissible evidence included Angel's admission that he committed misdemeanor sexual batteries against other women on July 9 using methods similar to those utilized in the June 18 attack as discussed above. Additional admissible evidence included Angel's admission that he previously had committed another offense near "T.J. School" similar to the July 9 misdemeanor sexual batteries. S.P. was attacked near Thomas Jefferson Middle School in Alexandria. S.P.'s description of her attacker was consistent with Angel's appearance and her description of the shirt worn by her attacker matched a shirt that was found in Angel's clothes hamper at his residence.

Based on this record, we agree with the Court of Appeals' conclusion that the admissible evidence constitutes "overwhelming evidence that [Angel] was the perpetrator of the June 18 misdemeanor sexual battery against S.P., and thus, any error in joining for trial that offense with the offenses against V.L. was harmless on the issue of guilt or innocence." Id., slip op. at 16.

29

We also agree with the Court of Appeals that joinder, if error, was harmless error with regard to Angel's sentence for the June 18 misdemeanor offense.  The trial court, not the jury, sentenced Angel, pursuant to Code § 16.1-272.  The nature and severity of Angel's crimes against V.L. were admitted for purposes relating to those crimes and, absent evidence to the contrary, we presume that the trial court did not consider this evidence in determining Angel's sentence for the misdemeanor sexual battery offense against S.P.  Yarborough v. Commonwealth, 217 Va. 971, 978, 234 S.E.2d 286, 291 (1977).

Finally, we address Angel's contention that evidence of the June 18 offense heard by the jury in relation to the July 9 offenses was not harmless error because it would impact the issue of intent with regard to the July 9 offenses.  It is not clear whether Angel is contending that, without evidence of the June 18 offense, the evidence would not support the element of intent or that the sentence would be different.  Either contention is without merit.  At trial, and in the Court of Appeals, Angel conceded that there was no issue as to motive or intent with respect to either the July 9 or June 18 offenses. Thus, the June 18 offense evidence would not cause a different result with respect to guilt based on the issue of intent.  With respect to an impact on sentencing, as discussed

30

above, the sentence was imposed by the court, not the jury, and we presume the court considered only relevant admissible evidence in sentencing Angel for the July 9 offenses. Id.

In summary, there was no error in the admission of evidence of other crimes because such evidence would be admissible in each trial had the charges based on the attacks on S.P. and V.L. been tried separately. Furthermore, in assuming without deciding that the joinder of the trials was error, the Court of Appeals did not err in concluding that any such error was harmless.

## V. Motion for Mistrial

In his fifth assignment of error, Angel asserts that the Court of Appeals erred in concluding that Angel's request for a mistrial made after the jury retired was untimely and that the Court of Appeals erred in holding that the denial of the mistrial was harmless error.

The following exchange occurred at the conclusion of the Commonwealth's rebuttal argument to the jury:

> [COMMONWEALTH]: But while you are deliberating, please keep her in your thoughts and think about what happened to her. 6:00, Sunday, July 9th. Leaves her house [at] 6:02. I think she remembered. She leaves her house, takes a walk just like she does every other day.
> 6:15, loving life, she's walking along, she's been watching the World Cup soccer. 6:20.

31

[DEFENSE COUNSEL]: Your Honor, I'm going to have to object. This is not rebuttal. It's not answering any of the facts I raised.

THE COURT: It's legitimate summation. Go ahead.

The Commonwealth continued, reciting the events of the attack and the injuries inflicted, concluding

[COMMONWEALTH]: While it doesn't have to define her, it certainly will be a part of her for the rest of her life, and it serves really as a reminder as to just how fragile life is and how everything can change in an instant, suddenly, without any warning.
     While we can't feel her pain, there is no way any of us can feel her pain, we can take a moment before you go back into the jury room and we can try to imagine it.

[DEFENSE COUNSEL]: Your Honor, I have a continuing objection.

[COMMONWEALTH]: Thank you.

THE COURT: Are you through?

[COMMONWEALTH]: Yes.

The trial court then noted the time as 5:15 p.m. and asked the jury whether they wanted to begin deliberation or return in the morning. The jury retired from the courtroom to decide when to begin deliberations. At this point, Angel's counsel moved for a mistrial stating

I am respectfully moving for a mistrial because the last portion of [the Commonwealth's] rebuttal, closing was, 'Having said I'm not going to appeal to your sympathy, I want you to decide this on the facts.' Goes on to discuss the events of that day that were not contested on during my closing argument.

32

So it was clearly to inflame the passion of the jury and to seek sympathy and I move for mistrial.

The trial court denied this motion.  The jury then returned and told the court that it wished to begin deliberations the following morning.

Referring to cases of this Court regarding the timeliness of motions for mistrial, the Court of Appeals held that because Angel did not move for a mistrial at the time the complained of words were spoken, he waived his objection. Beavers v. Commonwealth, 245 Va. 268, 278-79, 427 S.E.2d 411, 419 (1993); Yeatts v. Commonwealth, 242 Va. 121, 137, 410 S.E.2d 254, 264 (1991).  The rule cited by the Court of Appeals and recited in our cases is based on the principle that, in the absence of a contemporaneous objection and request for a curative instruction or mistrial, the trial court's ability to take effective corrective action is significantly, if not totally, impaired. While we have repeatedly required a contemporaneous objection to counsel's offending jury argument and request for a curative instruction or mistrial to preserve the issue for appeal, in considering whether the issue was preserved or waived, we have also examined the circumstances of each case to determine the facts surrounding the objection and motions.  Burns v. Commonwealth, 261 Va. 307, 341-42, 541 S.E.2d 872, 894-95 (2001); Reid v.

33

Baumgardner, 217 Va. 769, 772-74, 232 S.E.2d 778, 780-81 (1977).

In this case, no motion for a mistrial or curative instruction accompanied Angel's first objection to the Commonwealth's argument and Angel's assertions of error based on those statements are waived. Beavers, 245 Va. at 279, 427 S.E.2d at 419. However, after Angel's second objection, the Commonwealth rested and the trial court directed the jury to determine when to begin deliberation. As soon as the jury left the courtroom to decide when to begin deliberations, Angel's counsel addressed his concerns about the Commonwealth's argument and moved for a mistrial. No further argument or substantive proceeding occurred between the objection and the motion. Under these circumstances, we cannot say that the trial court's ability to take corrective action, if the objection was meritorious, was impaired; nor can we say that the time between the objection and asserting the motion for mistrial made the motion untimely. But see Beavers, 245 Va. at 279, 427 S.E.2d at 419 (objection and motion for mistrial untimely when made after allegedly prejudicial statements were uttered); Yeatts, 242 Va. at 137, 410 S.E.2d at 264 (motion for mistrial untimely when made the day after the alleged objectionable incident occurred); Cheng v. Commonwealth, 240 Va. 26, 40, 393 S.E.2d 599, 606-07 (1990)

34

(trial court not required to issue cautionary instruction or mistrial sua sponte when defendant failed to seek corrective action for prosecutor's alleged improper statements). Accordingly, we conclude that the Court of Appeals erred in holding that Angel waived his claim regarding his mistrial motion as to that part of the Commonwealth's argument addressed in Angel's second objection. Nevertheless, considering this issue on the merits, we conclude that denial of the mistrial motion was not error.[5]

Angel asserts that "[m]aterial which directly solicits the jurors to imagine themselves in the position of the victim of a brutal assault" is inadmissible. However, as recited above, statements of this nature were not the basis of Angel's

---

[5] In this assignment of error Angel also avers that the Court of Appeals erred in holding that "the denial of a mistrial was harmless error." However, it is not clear the Court of Appeals made such a holding. In that court, Angel asserted that if his request for a mistrial was untimely, the Court of Appeals should nevertheless address the issue under the "good cause" or "ends of justice exception" to that court's Rule 5A:18. In declining to apply the exception, the Court of Appeals held that "it is not apparent from the face of the record that an error occurred that was 'clear, substantial and material.' Because the statements complained of "did not compel the conclusion that the statement[s were] improper or, even if [they were,] that a mistrial was required to cure any prejudice." Angel, slip op. at 20. There was no specific holding of error. However at the end of its opinion the Court of Appeals recited that there was no error in denying the motion to suppress and dismissing the appeal of the certification determination and "as to the remaining assignments of error, we hold any error was harmless." Id., slip op. at 21.

35

motion for mistrial.  The motion only referred to the Commonwealth's recitation of the uncontested events of the attack as appealing to the sympathy of the jury.  The recitation of facts, including these facts, is not improper argument.  Accordingly, we cannot say the trial court abused its discretion in denying the motion for mistrial and we reject this assignment of error.  Blanton v. Commonwealth, 280 Va. 447, 455, 699 S.E.2d 279, 284 (2010) (motion for mistrial is reviewed for abuse of discretion).

VI.   Application of Graham v. Florida

On July 27, 2007, the trial judge sentenced Angel to three life sentences, plus sentences of twenty years and twelve months, all of which were to run consecutively. Virginia has abolished parole and, therefore, the effect of these sentences is that Angel will spend the rest of his life confined in the penitentiary.  Angel did not appeal these sentences to the Court of Appeals.  However his petition for appeal and brief on the merits before this Court contained an assignment of error claiming that the sentences constituted cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution.  He raises this issue because following the entry of judgment by the Court of Appeals, the Supreme Court of the United States granted certiorari in the case of Graham, 560 U.S. ___, 130 S.Ct. 2011

36

and, on July 6, 2010, rendered its modified decision.  In that decision, the Supreme Court held that the Eighth Amendment to the United States Constitution prohibited sentencing persons to life without parole for nonhomicidal crimes if they were less than 18 years of age when they committed the crime.  Id. at ___, 130 S.Ct. at 2030.  We included this assignment of error when we awarded Angel an appeal.[6]

The petitioner in Graham was 16 years old when he was originally charged as an adult for first and second degree felony charges, carrying maximum penalties of life imprisonment without parole and 15 years' imprisonment, respectively.  Pursuant to a plea agreement, the trial court withheld adjudication as to the charges and sentenced Graham to concurrent three-year terms of probation.  Id. at ___, 130 S.Ct. at 2018.  While on probation, Graham was arrested in connection with a home invasion robbery and another robbery, committed just before his eighteenth birthday.  Following a hearing, the trial court concluded that Graham had violated the terms of his probation, found Graham guilty of the earlier felony charges and sentenced him to the maximum sentence

---

[6] Both Angel and the Commonwealth acknowledge that this issue was not raised in the courts below, but both suggest that we address this issue in light of its significance in this case and, as the Commonwealth notes, "to provide guidance to trial courts in Virginia."

authorized for each offense.  Id. at ___, 130 S.Ct. at 2019-20.

The Supreme Court considered Graham's argument that his life sentence without parole violated the Eighth Amendment as a "categorical challenge to a term-of-years sentence," rather than whether the sentence was disproportionate for Graham's crime.  Id. at ___, 130 S.Ct. at 2022-23.  After determining that "a national consensus has developed against" sentencing juveniles who commit nonhomicidal crimes to life imprisonment without parole, that such a sentencing practice does not serve legitimate penological goals, particularly rehabilitation, and does not recognize the limited moral culpability of juvenile offenders, the Supreme Court concluded that the Eighth Amendment:

> Prohibits the imposition of a life without parole
> sentence on a juvenile offender who did not commit
> homicide . . . . if it imposes a sentence of life
> it must provide him or her with some realistic
> opportunity to obtain release before the end of
> that term.

560 U.S. at ___, 130 S.Ct. at 2034.

Angel argues that Virginia, like Florida, has eliminated parole, and therefore Graham requires vacation of his life sentences.  The Commonwealth replies that Graham does not require the result advanced by Angel because Code § 53.1-40.01 provides for the conditional release of prisoners who have

38

reached a certain age and served a certain length of imprisonment, thus complying with the Supreme Court's decision. We agree with the Commonwealth.

In its opinion the Supreme Court stated:

> A State is not required to guarantee eventual freedom to a juvenile offender convicted of a nonhomicide crime.  What the State must do, however, is give defendants like Graham some meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation.  It is for the State, in the first instance, to explore the means and mechanisms for compliance. . . . [The Eighth Amendment] does not require the State to release that offender during his natural life.

560 U.S. at ___, 130 S.Ct. at 2030.

The Supreme Court has left it up to the states to devise methods of allowing juvenile offenders an opportunity for release based on maturity and rehabilitation.  While the Supreme Court did not identify a specific method or methods that would provide "meaningful opportunity" for release, the Court clearly stated that states did not have to guarantee that the offender would be released.  Furthermore the Supreme Court did not require that states provide the opportunity for release at any particular time related to either the offender's age or length of incarceration.

Code § 53.1-40.01 provides:

> Any person serving a sentence imposed upon a conviction for a felony offense, other than a Class 1 felony, (i) who has reached the age of sixty-five or older and who has served at least five years of

39

the sentence imposed or (ii) who has reached the age
of sixty or older and who has served at least ten
years of the sentence imposed may petition the
Parole Board for conditional release.  The Parole
Board shall promulgate regulations to implement the
provisions of this section.

The regulations for conditional release under this statute provide that if the prisoner meets the qualifications for consideration contained in the statute, the factors used in the normal parole consideration process apply to conditional release decisions under this statute.  While this statute has an age qualifier, it provides, as the Commonwealth argues, the "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation" required by the Eighth Amendment.  Accordingly, we reject this assignment of error.

CONCLUSION

In summary, for the reasons stated, we hold that there was no reversible error in denying Angel's motion to suppress his custodial interrogation, in denying Angel's appeal of the order of the JDR court certifying the charges against him to the grand jury pursuant to Code § 16.1-269.1(B), in denying his motion to dismiss the indictments, in denying his motion for appointment and compensation for a DNA expert and denying his motion for a continuance, in joining the trials of separate offenses and admitting evidence of other crimes, and

40

in denying Angel's motion for mistrial.  We also hold that the imposition of life sentences without parole in this case is not cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution pursuant to Graham.  Accordingly, we will affirm the judgment of the Court of Appeals.

Affirmed.