COURT OF APPEALS OF VIRGINIA

Present: Judges Russell, Malveaux and Athey
Argued by videoconference

UNPUBLISHED

LEONEL PERRI ARROYO

                                        MEMORANDUM OPINION[*] BY

v.      Record No. 0135-20-2         JUDGE MARY BENNETT MALVEAUX

                                           MARCH 23, 2021

COMMONWEALTH OF VIRGINIA

FROM THE CIRCUIT COURT OF ALBEMARLE COUNTY
Humes J. Franklin, Jr., Judge Designate

David A. Eustis (Eustis & Graham, P.C., on brief), for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.

Leonel Perri Arroyo ("appellant") was convicted in a bench trial of rape, in violation of

Code § 18.2-61(A)(i). On appeal, he argues that the trial court erred when it sustained the

Commonwealth's objection to the introduction into evidence of text messages between the

victim and a third party. For the following reasons, we affirm the trial court.

## I. BACKGROUND

The victim, A.D.,[1] lived in Augusta, Georgia and was seventeen years old in June 2018.

Her father, appellant, had left Augusta the previous November to work in the Charlottesville

area. On June 20, 2018, A.D. took a bus to Charlottesville to visit appellant.

The following morning, appellant met A.D. at the bus station and took her to a motel

where he was staying. A.D. testified that at the motel she ate, showered, and napped before

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] We use the victim's initials, rather than her name, to protect her privacy.

watching a movie with appellant.  During the movie, A.D. and appellant lay on the same bed and A.D. fell asleep.

A.D. awoke on her stomach to feel a hand reaching into her underwear.  She stated that she "froze" and then felt the hand moving closer to her vagina.  Appellant rolled on top of A.D., and she was unable to move.  When she tried to yell, "nothing came out."  Appellant pulled down A.D.'s clothes and his own clothes, and A.D. "felt [appellant's] penis on my buttocks and he was trying to enter into me and he partially entered anally."  Appellant then "adjusted himself and forced himself" into A.D.'s vagina.  After approximately five minutes, appellant withdrew and ejaculated onto A.D.'s left buttock.  He then went into the bathroom.

Appellant later returned to bed, smoked a cigarette, and prepared to go to sleep.  When A.D. thought that appellant was asleep, she went into the bathroom and sent her friend, Derrick Long, a Snapchat message stating, "I was raped."  She then returned to bed and fell asleep.

When appellant woke up for work the next morning, he asked A.D. if she had told anyone what had happened.  He then asked her the identity of the friend she had contacted and asked for her phone to search for a copy of the message.  A.D. thought that Long had texted appellant to ask him what had happened to A.D. and where she was located.  Appellant told A.D. "that if I had told anybody that our lives were going to be over."

After he failed to find a copy of A.D.'s message, appellant left for work.  As he was leaving, he saw police officers in the motel lobby.  A.D. testified that appellant sent her a text message stating that "police officers were there, that he was going to jail, he was sorry for what he did, and he did not know what came over him."  The Commonwealth entered a screenshot of appellant's text message into evidence at trial.

When interviewed by police, appellant explained that he was used to sleeping with his wife and that in his sleep, he had "turned over and just put my arm around [A.D.], but that's it."

- 2 -

Appellant later stated that he remembered having a dream about his wife and that in the dream, the couple was having sex. He said that he "woke up and . . . came on [A.D.]." Appellant told police that he saw his ejaculate on A.D.'s t-shirt and a pillow she was hugging. Police asked appellant how he could have ejaculated on A.D. unless he had been naked. Appellant replied that when he woke up, his underwear was partially down and his genitals were exposed. During the interview, appellant did not allege any improper conduct by A.D.

During a forensic examination, A.D. reported significant pain in her vaginal area and told the nurse examiner that appellant had ejaculated on her left buttock. A.D. also told the nurse examiner that she was not sexually active at that time.

Dr. Jeanne Parrish, a forensic nurse practitioner for the University of Virginia Health System, was qualified at trial as an expert in forensic nurse examination. She testified that on June 22, 2018, she conducted a forensic sexual assault examination of A.D. Dr. Parrish noted an abrasion to the area between A.D.'s right labia. She explained that if A.D. "was on her stomach and was assaulted from behind, . . . if the penis missed the vagina on an initial impact like penetration, it would hit and that would account for what['s] . . . there." Dr. Parrish also noted a "pretty significant" tear at the base of the opening of A.D.'s vagina that was "a larger tear than what I typically see." Further, A.D.'s genitals were "very tender" during the examination and "the very top layer of the . . . mucosal tissue . . . had been sheared off." Dr. Parrish explained that while "[m]ost genital injuries heal within two to three days," the removal of the top layer of mucosal tissue "tends to be one of the first things to heal, [and] typically within twenty-four hours that would no longer be visible." The trial court asked Dr. Parrish whether A.D.'s injuries were "ordinarily found in consensual sex." She replied that while vaginal tears can result from consensual acts, "typically . . . they are much smaller" in that context. Further, Dr. Parrish noted,

- 3 -

"[t]he research has shown that consensual sex typically has one to two injuries that we find in the genital area. More than that suggests that it's nonconsensual."

Dr. Parrish collected vaginal/cervical swabs from A.D. as well as a left buttock swab from the area where A.D. indicated appellant had ejaculated on her. Those swabs, together with buccal swabs collected from appellant, were sent to the Virginia Department of Forensic Science for analysis. Appellant could not be eliminated as a contributor of the DNA profile developed from A.D.'s vaginal/cervical swab. Appellant also could not be eliminated as a contributor of the DNA profile developed from a sperm fraction detected in A.D.'s left buttock swab.

At trial, appellant testified that when he and A.D. had started watching a movie in his motel room, he was lying under a blanket on one side of the bed and A.D. was sitting on the other side of the bed. Appellant fell asleep but then awoke "partly because of [a] dream and partly because I felt . . . a hand on me." Although not fully awake and "not comprehending . . . exactly who was there," appellant was aware of a hand in his shorts that was manipulating his genitals. Appellant then felt the hand "grab[] me and put me towards to be inside of her." Appellant testified that after approximately one minute he "kind of backed out and at that point I just felt her hand come back on me. She . . . leaned on her back and just kept going till I ejaculated." Appellant testified that during this time he was "[c]onfused" after being awakened "in the middle of a dream and at that point really didn't know where I was or who I was, not thinking about who I was with." Appellant got up, went to the bathroom, returned to the bed and smoked a cigarette while thinking, "I can't believe this just happened." He then woke A.D. and told her, "I can't believe I just let this happen . . . . [T]his is wrong. This should not have happened. We cannot do that." When A.D. did not respond, appellant went back to sleep.

Appellant testified that when he got up to go to work, he saw that he had a Facebook message from a person named Derrick whom he did not know. The message referred to

something happening to A.D. and said that the sender was going to contact the police. Appellant woke A.D. and asked her about the message, saying, "I hope you know this can get us in a lot of trouble. . . . I hope you didn't tell him what I think you told him." A.D. did not respond. Appellant then left for work, saw the police, and texted A.D. that he thought he was going to jail, was "sorry for what happened," and "never meant . . . to hurt [her] in any way."

Appellant acknowledged that during his interview with police, he did not tell them about the sexual acts he later claimed A.D. performed on him. He then testified that he was not accusing A.D. of rape, as she did not "force herself" on him, but that he "didn't push. I didn't stop her from doing what I should have done which was stop her. I let it go along."

During cross-examination of A.D., counsel for appellant asked about her relationship with Derrick Long. A.D. stated that at the time of trial in May 2019, she and Long were engaged. She also acknowledged that she and Long had previously been in a relationship. However, at the time of the offense in June 2018, A.D. and Long had only recently reestablished contact after not communicating or seeing each other since September 2017. Asked whether she and Long had exchanged messages during the period "from September of 2017 until you came up" to Virginia, A.D. replied, "[n]othing of significant amount."

Counsel for appellant also questioned A.D. about A.D.'s statement to the forensic nurse that she was not sexually active at the time of the offense. When asked if it was "a true statement, that you were not sexually active at the time," A.D. replied, "[y]es, sir." Counsel for appellant then proffered a series of undated, sexually explicit text messages purportedly exchanged between Long and A.D. The messages described a series of sexual acts that the parties wished to engage in with each other.

When the Commonwealth objected to the proffered texts, counsel for appellant stated that he was "trying to establish when these were sent because it directly contradicts the report made

to the nurse." The Commonwealth argued that the text messages were inadmissible for two reasons. First, they lacked a proper foundation because they were undated. Second, the messages would be "in violation of [Code § 18.2-67.7,] the rape shield act. . . . [Appellant] wants to show some texts that talk about potential sexual activity to directly contradict the statement [A.D.] made to the nurse." Counsel for appellant replied that the evidence did not implicate the rape shield statute and was instead simply impeachment evidence. The trial court sustained the Commonwealth's objection.

The trial court found appellant guilty of rape, stating that "the testimonial evidence coupled with the physical examination evidence coupled with the scientific evidence leaves absolutely and positively no room for any reasonable doubt."

This appeal followed.

## II. ANALYSIS

Appellant argues that the trial court erred by sustaining the Commonwealth's objection to the introduction into evidence of the text messages purportedly exchanged between A.D. and Long.

"Decisions regarding the admissibility of evidence 'lie within the trial court's sound discretion and will not be disturbed on appeal absent an abuse of discretion.'" Blankenship v. Commonwealth, 69 Va. App. 692, 697 (2019) (quoting Michels v. Commonwealth, 47 Va. App. 461, 465 (2006)). "'Only when reasonable jurists could not differ can we say an abuse of discretion has occurred.' To the extent that [a] case involves the trial court's application of a statute, however, we review that issue *de novo*." Raspberry v. Commonwealth, 71 Va. App. 19, 26 (2019) (quoting Blankenship, 69 Va. App. at 697).

Code § 18.2-67.7, commonly known as Virginia's "rape shield" statute, provides that absent agreement by the complaining witness, "evidence of specific instances of his or her prior

sexual conduct shall be admitted only" if a statutorily enumerated exception is met.  Code § 18.2-67.7(A); see Code § 18.2-67.10(5) (defining the complaining witness' "'prior sexual conduct' [as] mean[ing] any sexual conduct on the part of the complaining witness which took place before the conclusion of the trial, excluding the conduct involved in the offense alleged").  The statute further provides that no such evidence shall be admitted or referred to at trial "until the court first determines the admissibility of that evidence at an evidentiary hearing to be held before the evidence is introduced at . . . trial."  Code § 18.2-67.7(C); see also Va. R. Evid. 2:412(c).

Appellant argues that the trial court erred in sustaining the Commonwealth's objection to the introduction of the text messages because in attempting to introduce the messages into evidence, he "did not seek to introduce instances, specific or otherwise, of [A.D.'s] prior sexual conduct."  Rather, he sought the messages' introduction to impeach A.D.'s testimony.

Based on the record, we need not decide whether the trial court erred in sustaining the Commonwealth's objection to the introduction of the text messages because any alleged error by the court was clearly harmless.

"We 'will not reverse a trial court for evidentiary errors that were harmless to the ultimate result.'"  Hillman v. Commonwealth, 68 Va. App. 585, 601 (2018) (quoting Shifflett v. Commonwealth, 289 Va. 10, 12 (2015)).  Purported evidentiary errors are examined "under the standard for non-constitutional harmless error.  Non-constitutional error is harmless '[w]hen it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached.'"  Salahuddin v. Commonwealth, 67 Va. App. 190, 211-12 (2017) (alteration in original) (quoting Code § 8.01-678).  Thus, this Court may uphold a trial court's decision on harmless error grounds "only if it can conclude, without usurping the [trial court's] fact-finding function, 'that the error did not influence the [trial court]

or had but slight effect.'" Graves v. Commonwealth, 65 Va. App. 702, 712 (2016) (quoting Clay v. Commonwealth, 262 Va. 253, 260 (2001)). Stated differently, "[i]f other evidence of guilt is so overwhelming and the error insignificant, by comparison, supporting a conclusion that the error did not have a substantial effect on the verdict, the error is harmless." Angel v. Commonwealth, 281 Va. 248, 268 (2011).

Here, assuming without deciding that the trial court erred in sustaining the Commonwealth's objection to the introduction of the text messages, overwhelming evidence supports the conclusion that admitting the messages into evidence would not have affected the court finding appellant guilty of rape.[2]

As noted above, A.D. testified at trial that while she was lying on the same bed with appellant in his motel room, appellant lay on top of her so that she was unable to move. He then pulled down her clothes and penetrated her vagina with his penis before withdrawing and ejaculating on her left buttock. The next day A.D. submitted to a forensic sexual assault examination. Appellant could not be eliminated as a contributor of the DNA profile developed from A.D.'s vaginal/cervical swab or from the sperm fraction found on her left buttock. In addition, the nurse who conducted A.D.'s sexual assault examination testified that she had observed an abrasion to the area between A.D.'s right labia and opined that it could be accounted for if A.D. had been lying on her stomach and had been assaulted from behind. She also noted that she had observed a "pretty significant" tear at the base of the opening of A.D.'s vagina that was "larger than what I typically see" and opined that when such tears occur during consensual sex, "typically . . . they are much smaller." Further, the top layer of A.D.'s mucosal tissue had

---

[2] We note that in convicting appellant of rape, in violation of Code § 18.2-61(A)(i), the trial court necessarily found the evidence sufficient to prove beyond a reasonable doubt that appellant had engaged in sexual intercourse with A.D. and that the act was accomplished against her will by force, threat, or intimidation. See Code § 18.2-61(A)(i) (providing the elements of statutory rape); Lawlor v. Commonwealth, 285 Va. 187, 226 (2013) (discussing same).

been sheared off, which usually would have healed within twenty-four hours of injury. After noting these three injuries, the nurse examiner opined that "consensual sex typically has one to two injuries that we find in the genital area. More than that suggests that it's nonconsensual."

A.D. also testified that shortly after she was assaulted, she sent Derrick Long a Snapchat message stating that she had been raped. Appellant acknowledged at trial that when he got up for work the following morning, he saw that he had received a message from someone named Derrick who told him something had happened to A.D. and that Derrick was going to call the police. A.D. testified that appellant had asked her whom she had contacted, tried to find a copy of the outgoing message on her phone, and told her that "if I had told anybody that our lives were going to be over." Appellant told the trial court that he had asked A.D. about her message and acknowledged that he had told her, "I hope you know this can get us in a lot of trouble. . . . I hope you didn't tell him what I think you told him." Soon after appellant left for work, A.D. testified that appellant sent her a text message informing her that police were at the motel and that he was going to jail, was sorry for what he had done, and that he did not know what had come over him. In his testimony, appellant also acknowledged sending such a text and a screenshot of the text was entered into evidence.

Lastly, appellant acknowledged to police that he had ejaculated on A.D. and claimed that this was the consequence of a dream he had experienced. Further, appellant did not make any allegation to police that A.D. had voluntarily engaged in sexual activity with him. At trial, however, he testified that he had awakened in the motel in a confused state to find a hand "playing with" his genitals before it "grabbed me and put me towards to be inside of her." After appellant "backed out," he "just felt her hand come back on[to] me . . . till I ejaculated." As the judge of appellant's credibility as a witness, the trial court was entitled to disbelieve appellant's

self-serving testimony and conclude that he was lying to conceal his guilt.  See Speller v. Commonwealth, 69 Va. App. 378, 388 (2018).

Based upon this record, even if the text messages had been admitted for impeachment purposes, the DNA and forensic evidence, appellant's text to A.D., and appellant's own testimony and statements to police would have provided the trial court with overwhelming evidence corroborating A.D.'s testimony that appellant raped her.  Thus, we conclude that any alleged error by the trial court in sustaining the Commonwealth's objection to the introduction of the text messages into evidence was harmless as their introduction would not have influenced the trial court's decision or would have had but slight effect.

### III.  CONCLUSION

For the foregoing reasons, we hold that if the trial court erred in the admission of certain text messages, any such error was harmless.  Accordingly, we affirm appellant's conviction.

Affirmed.