PRESENT: Lemons, C.J., Goodwyn, Mims, McClanahan, and Powell, JJ., and Russell and Millette, S.JJ.

RAHEEM CHABEZZ JOHNSON

v. Record No. 141623

COMMONWEALTH OF VIRGINIA

OPINION BY
JUSTICE CLEO E. POWELL
December 15, 2016

FROM THE COURT OF APPEALS OF VIRGINIA

Raheem Chabezz Johnson ("Johnson") appeals the trial court's refusal to appoint a neuropsychologist at the Commonwealth's expense to assist in the preparation of his presentence report pursuant to Code § 19.2-299(A). Johnson further takes issue with the Court of Appeals' affirmance of the trial court's decision to impose a life sentence. According to Johnson, the life sentence imposed by the trial court was in violation of the Eighth Amendment because the trial court failed to afford him the opportunity to present evidence about youth and its attendant characteristics.

I. BACKGROUND

On April 11, 2011, Johnson shot and killed Timothy Irving. At the time, Johnson was two months short of his eighteenth birthday. On June 1, 2011, Johnson was indicted on eight felonies, including capital murder. After his indictment but before trial, the United States Supreme Court decided *Miller v. Alabama*, 132 S. Ct. 2455 (2012). As a result, the Commonwealth amended the indictment to reduce the capital murder charge to first degree murder. A jury subsequently convicted Johnson of all eight felonies.

The trial court ordered a presentence report and continued the matter for sentencing. On August 3, 2012, Johnson moved to have Joseph Conley, Ph.D. ("Dr. Conley"), a neuropsychologist, appointed at the Commonwealth's expense, to serve as an expert to assist in

the preparation for his sentencing hearing. In his motion, Johnson noted that Dr. Conley had "devoted his practice to the study of the maturation of the brain and its functioning." Johnson argued that Dr. Conley would "provide relevant facts specific to Raheem C. Johnson so as 'to fully advise the court' of all matters specific to Raheem C. Johnson and allow the fashioning of a sentence in compliance with the 8th Amendment to the United States Constitution."

At a hearing on the matter, Johnson argued that Dr. Conley's assistance was necessary because the probation officer charged with compiling the presentence report "does not have the ability to collect the necessary details about what is happening within [Johnson's] mind, how [Johnson's] mind has developed." Johnson asserted that Dr. Conley's "facts or unique abilities" would allow him to develop "other relevant facts needed to individualize the punishment that [the trial court] is going to have to mete out." In response, the Commonwealth stated that Johnson had not demonstrated the requisite particularized need to have Dr. Conley appointed at the Commonwealth's expense because it was "common sense" that a juvenile is less mature than an adult. The Commonwealth also noted that Johnson was not facing life without parole because Johnson would be eligible for geriatric parole at age 60.

After considering the matter, the trial court denied Johnson's motion. The trial court noted that nothing in Johnson's record supported his position that such an evaluation was needed. It further stated that Johnson had not shown a particularized need because, in the trial court's opinion, *Miller* did not require such an evaluation in every case where the accused was a juvenile at the time of the offense.

Prior to sentencing, Johnson submitted four articles that discuss brain development and legal culpability. At the sentencing hearing, the trial court acknowledged that it had read the

2

articles Johnson submitted and considered them along with the presentence report and Johnson's school records. After hearing argument from the parties, the trial court stated:

> Mr. Johnson, in this case we had a helpless victim, the shooting was unprovoked, and it was cruel and callous. It was just mean. It was, it's as cruel and callous as anything I've seen since I've been sitting here on the bench, and that's been awhile. Just totally unnecessary to put a bullet in this young man's head.

The trial court then proceeded to sentence Johnson to life in prison for the first degree murder charge plus an additional 42 years for the other seven charges.

Johnson filed a motion to reconsider, arguing that the trial court failed to properly consider the articles he submitted and the Supreme Court's ruling in *Miller* before imposing Johnson's sentence. Johnson further asserted that, by imposing a life sentence, the trial court ignored the fact that, statistically, geriatric parole was not a realistic opportunity to obtain early release. The trial court denied the motion without a hearing.

In a letter opinion, the trial court explained that it imposed a life sentence "after careful consideration of [Johnson's] individual characteristics as reflected in the record, including without limitation the presentence report and school records." The trial court also reiterated that it had reviewed the articles Johnson submitted. The trial court noted the "horrendous nature of the crime" and determined that Johnson's "history of disrespect for authority and aggressive behavior which, coupled with the brutality of the offense, make [Johnson] . . . a danger to himself and others should he be returned to society."

Johnson appealed the trial court's refusal to appoint a neuropsychologist and its decision to impose a life sentence to the Court of Appeals. The Court of Appeals denied Johnson's petition for appeal with regard to the denial of his motion for a neuropsychologist, but granted his petition with regard to the sentence imposed. In a published opinion, the Court of Appeals subsequently determined that, because a sentence of life did not exceed the statutory maximum

3

penalty for first-degree murder, the trial court had not erred. *Johnson v. Commonwealth*, 63 Va. App. 175, 182-85, 755 S.E.2d 468, 471-73 (2014). The Court of Appeals further held that, because Johnson was not facing a mandatory life sentence, *Miller* did not apply. *Id.* at 183-84, 755 S.E.2d at 472.

Johnson appeals.

## II. ANALYSIS

On appeal, Johnson argues that the Court of Appeals erred in refusing to consider his appeal related to the trial court's denial of the motion for the appointment of a neuropsychologist on his behalf at the Commonwealth's expense. Additionally, he asserts that, under *Miller*, the Court of Appeals erred in affirming the trial court's decision to impose a life sentence because he was not afforded the opportunity to present evidence regarding youth and its attendant consequences.

## A. Motion for a Neuropsychologist

Johnson contends that the trial court erred in denying his motion for the appointment of a neuropsychologist on his behalf at the Commonwealth's expense because he demonstrated a particularized need for the services of a neuropsychologist. Johnson asserts that he demonstrated the requisite "particularized need" established by this Court in *Husske v. Commonwealth*, 252 Va. 203, 476 S.E.2d 920 (1996). He also relies on the fact that Code § 19.2-299(A) requires that a presentence report include "other relevant facts." Johnson claims that evidence relating to his physiology or psychology were such "other relevant facts." Thus, according to Johnson, even in the absence of showing a particularized need, the services of a neuropsychologist were necessary to provide a complete presentence report. He further asserts that such evidence was necessary to allow the trial court to "tailor" the punishment to him. We disagree.

4

This Court has recognized that, upon request, the Commonwealth is required to "provide indigent defendants with 'the basic tools of an adequate defense.'" *Husske*, 252 Va.at 211, 476 S.E.2d at 925 (quoting *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985)). However, "an indigent defendant's constitutional right to the appointment of an expert, at the Commonwealth's expense, is not absolute." *Id.* Rather,

> an indigent defendant who seeks the appointment of an expert witness, at the Commonwealth's expense, must demonstrate that the subject which necessitates the assistance of the expert is "likely to be a significant factor in his defense," and that he will be prejudiced by the lack of expert assistance. An indigent defendant may satisfy this burden by demonstrating that the services of an expert would materially assist him in the preparation of his defense and that the denial of such services would result in a fundamentally unfair trial. The indigent defendant who seeks the appointment of an expert must show a particularized need . . . .

*Id.* at 211-12, 476 S.E.2d at 925 (quoting *Ake*, 470 U.S. at 82-83).

Furthermore, "[w]hether a defendant has made the required showing of particularized need is a determination that lies within the sound discretion of the trial court." *Commonwealth v. Sanchez*, 268 Va. 161, 165, 597 S.E.2d 197, 199 (2004) (citing *Husske*, 252 Va. at 212, 476 S.E.2d at 926, and other case authority). "A particularized need is more than a 'mere hope' that favorable evidence can be obtained through the services of an expert." *Green v. Commonwealth*, 266 Va. 81, 92, 580 S.E.2d 834, 841 (2003) (quoting *Husske*, 252 Va. at 212, 476 S.E.2d at 925-26). In the present case, Johnson admitted that he sought the services of a neuropsychologist because there was no other evidence regarding his physiology or psychology. In other words, Johnson sought the assistance of an expert at the Commonwealth's expense with no idea what evidence might be developed or whether it would assist him in any way. At best, Johnson's request for a neuropsychologist amounted to a mere hope that favorable evidence would be

5

obtained. Thus, it cannot be said that Johnson demonstrated a particularized need for the assistance of a neuropsychologist.

Johnson next argues that, under Code § 19.2-299(A), he was entitled to the appointment of a neuropsychologist independent of any showing of a particularized need. Code § 19.2-299(A) states that, upon a finding of guilt, a trial court may (or, under certain circumstances, shall) direct a probation officer to

> thoroughly investigate and report upon the history of the accused, including a report of the accused's criminal record as an adult and available juvenile court records, any information regarding the accused's participation or membership in a criminal street gang as defined in § 18.2-46.1, *and all other relevant facts*, to fully advise the court so the court may determine the appropriate sentence to be imposed.

*Id.* (emphasis added).

Nothing in the plain language of Code § 19.2-299(A) specifically requires a probation officer to investigate a defendant's current physiology or psychology.[1] Indeed, the statute expressly limits the subject of the probation officer's investigation and report to "the *history* of the accused." *Id.* (emphasis added). When read in context, it is clear that the phrase "all other relevant facts" is used to describe additional historical information that may be relevant to the probation officer's investigation and report.

Thus, it is clear that Code § 19.2-299(A) does not envision the appointment of a neuropsychologist to augment the presentence report. That said, however, if information regarding a defendant's physiology or psychology exists in a defendant's history, that

_____

[1] Notably, Code § 19.2-299(A) only describes the investigation that must be conducted by the probation officer and the contents of that probation officer's report. Although the statute provides a defendant with an opportunity to "present any additional facts bearing upon the matter," such an opportunity only arises *after* the probation officer has completed his investigation and submitted his report. Similarly, the statute is silent on the manner in which such facts may be developed.

6

information might well be included as "other relevant facts" in the presentence report.

Moreover, such information could be used as part of the showing necessary to demonstrate a

"particularized need" under *Husske* or presented as "additional facts bearing upon the matter" in

response to the presentence report. *See* Code § 19.2-299(A). Accordingly, the trial court did not

abuse its discretion in denying Johnson's motion for the appointment of a neuropsychologist at

the Commonwealth's expense and the Court of Appeals did not err in upholding this

determination.[2]

### B. Life Sentence

Johnson next argues that the trial court erred in sentencing him to life in prison. Relying

on the Supreme Court's decision in *Miller v. Alabama*, Johnson claims that, because he was still

a juvenile on the date that he committed the crimes, the trial court was required to consider the

psychological differences between adults and juveniles before imposing a life sentence. Johnson

further contends that, in the absence of such consideration, the sentence imposed by the trial

court was not individualized and, therefore, violated the Eighth Amendment. However, we

conclude that *Miller* is inapplicable to the present case. Therefore, the trial court did not err.

In *Miller*, the Supreme Court held that a sentence of "mandatory life without parole for

those under the age of 18 at the time of their crimes violates the Eighth Amendment's prohibition

on 'cruel and unusual punishments.'" 132 S.Ct. at 2460. However, by its plain language, *Miller*

only applies where a juvenile offender is sentenced to a term of life *without parole*. Notably, the

Supreme Court's analysis in *Miller* is founded, in part, on the notion that sentencing a juvenile to

---

[2] Johnson also asserts that the Supreme Court's decision in *Miller* further demonstrates the requisite "particularized need." However, as discussed below, Johnson's reliance on *Miller* is misplaced and, therefore, we need not address whether the applicability of *Miller* to a specific case can provide a "particularized need" under the proper circumstances.

life in prison is a disproportionate sentence because a juvenile sentenced to life without parole is

analogous to capital punishment. *Id.* at 2466. In contrast, "[a]llowing those offenders to be

considered for parole ensures that juveniles whose crimes reflected only transient immaturity—

and who have since matured—will not be forced to serve a disproportionate sentence in violation

of the Eighth Amendment." *Montgomery v. Louisiana*, 136 S. Ct. 718, 736 (2016). Indeed, it is

particularly telling that the remedy for a *Miller* violation is to "permit juvenile homicide

offenders to be considered for parole." *Id.* Thus it is clear that *Miller* does not apply when a

juvenile offender has the opportunity to be considered for parole.

In *Angel v. Commonwealth*, 281 Va. 248, 275, 704 S.E.2d 386, 402 (2011), we held that

the possibility of geriatric release under Code § 53.1-40.01[3] provides a meaningful opportunity

for release that is akin to parole. As Johnson was convicted of a Class 2 felony, he will be

eligible for geriatric release under Code § 53.1-40.01 when he turns 60 in 2053, in which case

the possibility exists that Johnson's sentence of life imprisonment will convert into a sentence of

approximately forty years.[4] Thus, it is readily apparent that, under this Court's jurisprudence,

---

[3] Code § 53.1-40.01 states:
> Any person serving a sentence imposed upon a conviction for a
> felony offense, other than a Class 1 felony, (i) who has reached the
> age of sixty-five or older and who has served at least five years of
> the sentence imposed or (ii) who has reached the age of sixty or
> older and who has served at least ten years of the sentence imposed
> may petition the Parole Board for conditional release. The Parole
> Board shall promulgate regulations to implement the provisions of
> this section.

[4] While Johnson makes much about the low statistical probability of release under Code
§ 53.1-40.01, we find his argument to be, at present, speculative because the statistical data
Johnson relies on does not include juvenile offenders. Indeed, as has been recently noted,

> The geriatric release program was not implemented until 1994.
> See 1994 Acts (Sp. Sess. II) 1, 2 (enacting Code § 53.1-40.01). A
> hypothetical 17-year old sentenced to a life sentence or a de facto
> life sentence in 1995 will not be eligible for geriatric release until

Johnson was only sentenced to life in prison; he was not sentenced to life without parole. Accordingly, Johnson's reliance on *Miller* is misplaced.

### III. CONCLUSION

Having failed to demonstrate the requisite particularized need for the appointment of a neuropsychologist at the Commonwealth's expense, Johnson has failed to show any abuse of discretion in the decision of the trial court that mandated review by the Court of Appeals. Additionally, as Code § 53.1-40.01 provides Johnson with a meaningful opportunity for parole when he turns 60, *Miller* has no application to the present case. Accordingly, we find no reversible error in the judgment of the Court of Appeals and we will affirm the decisions of the trial court.

*Affirmed.*

---

2038. Moreover, inmates who committed their crimes before January 1, 1995 are still eligible for traditional parole. See Code §§ 53.1-151, 53.1-165.1. Accordingly, a number of inmates, who would be eligible for geriatric release, obtain release through traditional parole instead.

*Vasquez v. Commonwealth*, 291 Va. 232, 258 n. 4, 781 S.E.2d 920, 935 n.4 (2016) (Mims, J., concurring).

SENIOR JUSTICE MILLETTE, concurring.

I agree with the majority's analysis concluding that Johnson is not entitled to a neuropsychologist under *Husske v. Commonwealth*, 252 Va. 203, 476 S.E.2d 920 (1996). I write separately because I disagree with the majority's conclusion that "*Miller* [*v. Alabama*, 567 U.S. ___, 132 S. Ct. 2455 (2012)] is inapplicable to the present case" because geriatric release "provides a meaningful opportunity for release akin to parole." While the majority applies existing Virginia precedent, I believe *Miller* and *Montgomery v. Louisiana,* 577 U.S. ___, 136 S. Ct. 718 (2016), do not suggest but rather require that this Court reexamine our position. However, because I conclude that Johnson's sentencing ultimately comported with *Miller* and *Montgomery,* and the trial court met its burden under the Eighth Amendment, I concur in the result.

I.

As an initial matter, *Miller* and *Montgomery* are not limited in scope to mandatory life sentences. Rather, *Miller*, as explicated in *Montgomery*, is the touchstone for constitutional sentencing of children potentially facing a sentence of life imprisonment without parole.

In examining the scope of *Miller* and *Montgomery*, it is necessary to take two short steps back in the jurisprudence of the Supreme Court of the United States. In *Roper v. Simmons*, 543 U.S. 551, 575 (2005), the Supreme Court found the death sentence to be a disproportionate punishment, and therefore cruel and unusual for juveniles for Eighth Amendment purposes. In *Graham v. Florida*, 560 U.S. 48, 74, 75 (2010), the Supreme Court issued a blanket ban on the imposition of a sentence of life without parole for juvenile nonhomicide offenders, in part because the penalty of life without parole "forswears altogether the rehabilitative ideal." These two cases would ultimately form the bedrock of the holdings reached in *Miller* and *Montgomery*.

10

Two years later, *Miller* arose in the context of a challenge to mandatory life without parole for a juvenile homicide offender. In *Miller*, the Supreme Court did "not categorically bar a penalty for a class of offenders or type of crime—as, for example, [the Court] did in *Roper* or *Graham*. Instead, it mandates only that a sentencer follow a certain process—considering an offender's youth and attendant characteristics—before imposing a particular penalty." *Id.* at ___, 132 S. Ct. at 2471. Such a process is required, in short, because "children are constitutionally different from adults for the purposes of sentencing." *Id.* at ___, 132 S. Ct. at 2464 (citing *Roper*, 543 U.S. at 569-70 and *Graham*, 560 U.S. at 68). The Court held not that a life sentence without parole was *never* appropriate for a juvenile, but rather that "a judge or jury must have the opportunity to consider mitigating circumstances before imposing the harshest possible penalty for juveniles." *Id.* at __, 132 S. Ct. at 2475. Accordingly, *Miller* held mandatory life sentences for juvenile offenders to be unconstitutional, and mandated that a process be followed considering the "offender's youth and attendant characteristics" before sentencing juveniles to life without parole. *Id.* at __, 132 S. Ct. at 2471.

Courts initially struggled with the interaction of *Miller's* substantive and procedural components, resulting in the subsequent opinion of *Montgomery*, which plainly states *Miller's* key substantive and procedural holdings. *Montgomery* clarified that *Miller* set forth the following substantive rule of law:

> Even if a court considers a child's age before sentencing him or her to a lifetime in prison, that sentence still violates the Eighth Amendment for a child whose crime reflects "unfortunate yet transient immaturity." Because *Miller* determined that sentencing a child to life without parole is excessive for all but "the rare juvenile offender whose crime reflects irreparable corruption," it rendered life without parole an unconstitutional penalty for "a class of defendants because of their status"—that is, juvenile offenders whose crimes reflect the transient immaturity of youth.

11

*Id.* at ___, 136 S. Ct. at 734 (citations and internal quotation marks omitted). *Montgomery* also emphasized *Miller*'s parallel, prospective procedural holding: "*Miller* requires a sentencer to consider a juvenile offender's youth and attendant characteristics before determining that life without parole is a proportionate sentence." *Id.*

While *Miller* rendered mandatory sentences of life without parole facially unconstitutional, its impact was not limited to mandatory sentences. *Miller's* facial holding that mandatory life sentences without parole were unconstitutional was required by the dual central holdings clarified in *Montgomery*: that life without parole is a violation of the Eighth Amendment for "juvenile offenders whose crimes reflect the transient immaturity of youth," and, that "*Miller* requires a sentencer to consider a juvenile offender's youth and its attendant characteristics" before rendering a sentence of life without parole. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734. Because mandatory sentences do not allow for such consideration, they "necessarily carr[y] a significant risk that a defendant – here, the vast majority of juvenile offenders – faces a punishment that the law cannot impose on him": that "a child whose crime reflects unfortunate yet transient immaturity" might receive life without parole. *Id.* (citations and internal quotation marks omitted).

Yet a non-mandatory sentence of life without parole can still be unconstitutional as applied to a given defendant, if such a juvenile is sentenced to life without parole without consideration of "youth and its attendant characteristics." *Id.*; *United States v. Johnson*, No. 3:08-cr-0010, 2016 U.S. Dist. LEXIS 83459, at *5-6 (W.D.Va. June 28, 2016) ("[A]bsolutist statutes like those in *Miller* and *Montgomery* are facially unconstitutional. But a particular life sentence (even one stemming from a sentencing regime that permits a non-life sentence) would be unconstitutional as-applied if the sentence did not abide by the commands of *Miller* and

12

*Montgomery*."). *Montgomery* is clear that, prospectively, "[a] hearing *where youth and its attendant characteristics are considered as sentencing factors* is necessary to separate those juveniles who may be sentenced to life without parole from those who may not. The hearing . . . gives effect to *Miller's* substantive holding that life without parole is an excessive sentence for children whose crimes reflect transient immaturity."[1] *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735 (emphasis added) (citation and internal quotation marks omitted).

The Supreme Court in *Miller* could have simply struck down mandatory life without parole as unconstitutional. Instead, it devoted the majority of its opinion and holding to the importance of this procedural consideration of youth. This procedural requirement is ineffectual if limited to only "mandatory" sentencing schemes. *Montgomery* clarifies that the substantive rule of law set forth in *Miller* is that life without parole—not mandatory life without parole, but "life without parole"—is "an unconstitutional penalty for . . . juvenile offenders whose crimes reflect the transient immaturity of youth." *Id.* at ___, 136 S. Ct. at 734.[2] Accordingly, *Montgomery* also makes clear that a *Miller* hearing procedurally requires not just discretion to enter a lesser sentence, but *actual* consideration of youth by the sentencer, *id.*, or the entire portion of the opinion and holding in *Miller* addressing procedure would be rendered superfluous.

## II.

Of course, none of the foregoing observations are consequential if Johnson received a sentence that provides, through parole or a similar system, a meaningful opportunity for release

---

[1] Retroactively, *Montgomery* allows for reviews after a term of years to satisfy this requirement without disturbing finality. 577 U.S. at ___, 136 S. Ct. at 736.

[2] The Supreme Court's recent action bolsters this view. *Arias v. Arizona*, No. 15-9044, 2016 U.S. LEXIS 6585 (Oct. 31, 2016) (vacating and remanding a judgment predicated upon the refusal of the Court of Appeals of Arizona to grant *Miller* relief to a juvenile who did not receive a mandatory life sentence).

based on maturation and rehabilitation. The majority, observing that *Miller* and *Montgomery* do not apply in instances of parole, relies on our previous decision in *Angel v. Commonwealth*, 281 Va. 248, 275, 704 S.E.2d 386, 402 (2011), for the proposition that geriatric release is "akin to parole."

The Commonwealth abolished parole two decades ago. Code § 53.1-165.1. Non-capital juvenile homicide offenders in Virginia remain eligible to apply for geriatric release at the age of 60. Code § 53.1-40.01. Five years ago, in light of *Graham*, this Court was first tasked with examining whether those juvenile nonhomicide offenders eligible for geriatric release fell under *Graham's* prohibition against life imprisonment without parole, or rather had a "meaningful opportunity" for release. 560 U.S. at 75.

At the time, I joined this Court's opinion in *Angel*, 281 Va. at 275, 704 S.E.2d at 402, concluding that nonhomicide offenders in Virginia were not subject to life without parole under *Graham* because geriatric release offered a "meaningful opportunity" for release, thereby preventing those life sentences from implicating the Eighth Amendment concerns raised by *Graham*.

Our mandate in light of *Graham* alone was substantially narrower than the vision of the Eighth Amendment set forth by the Supreme Court today. *Graham* noted, for example, that:

> It bears emphasis . . . that while the Eighth Amendment prohibits a State from imposing a life without parole sentence on a juvenile nonhomicide offender, it does not require the State to release that offender during his natural life. Those who commit truly horrifying crimes as juveniles may turn out to be irredeemable, and thus deserving of incarceration for the duration of their lives. The Eighth Amendment does not foreclose the possibility that persons convicted of nonhomicide crimes committed before adulthood will remain behind bars for life. It does prohibit States from making the judgment at the outset that those offenders never will be fit to reenter society.

14

560 U.S. at 75. Additionally, the caveat that meaningful opportunity for release be "based on demonstrated maturity and rehabilitation," while present in *Graham*, *id.,* was not emphasized as central to the holding in the case. The opinion went on to refer to "meaningful opportunity to obtain release" without caveat, *id.* at 79, and, notably, the conclusion in *Graham* synthesized the holding as simply: "A State need not guarantee the offender eventual release, but if it imposes a sentence of life it must provide him or her with *some realistic opportunity to obtain release before the end of that term.*" *Id.* at 82 (emphasis added).

Accordingly, in *Angel* this Court considered whether the Virginia geriatric release system was sufficiently distinguishable from life without parole as described in *Graham*, and concluded that it was; we found it offered a meaningful opportunity for release. 281 Va. at 275, 704 S.E.2d at 402. While we also noted that normally applicable consideration procedures of the Parole Board would provide for meaningful release based on demonstrated maturity and rehabilitation, we devoted only two sentences to consideration of that issue. *Id.* *Roper*, a death penalty case, was unrelated to our analysis. I believe we made an informed decision based on the guidance provided to us from the Supreme Court at the time.

I do not believe we sit in the same position today. We now must consider the issue in light of *Roper*, *Graham*, *Miller*, and *Montgomery*, and the clear indication by the Supreme Court of the United States that these cases are to be read together. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 734; *Miller*, 567 U.S. at __, 132 S. Ct. at 2461-2469. As stated in *Montgomery*, *Graham* was the "foundation stone" for *Miller*, and "*Miller* took as its starting premise the principle established in *Roper* and *Graham* that 'children are constitutionally different from adults for purposes of sentences.'" 577 U.S. at ___, 136 S. Ct. at 732-33. We must consider these holdings not as substantive rules unto themselves but parts of the larger, functioning

15

understanding of the Eighth Amendment; as such, they cannot be understood in a vacuum, but must be read together to properly apply Eighth Amendment protections.

*Miller* and *Montgomery* provide a more robust analytical framework for considering the issue of geriatric release. *Graham's* requirement of "meaningful opportunity for release *based on demonstrated maturity and rehabilitation*," 560 U.S. at 75 (emphasis added), contains new meaning and import in light of the emphasis in *Miller* and *Montgomery* on the distinction between transient behavior and incorrigibility. Through the lens of *Miller* and *Montgomery*, it appears that the "meaningful" or "realistic" opportunity to obtain release referred to in *Graham* always contemplated meaningful release based on demonstrated maturity and rehabilitation.

Geriatric release, as it currently exists in the Commonwealth, is fundamentally not a system that ensures review and release based on demonstrated maturity and rehabilitation. Virginia's traditional parole system[3] requires consideration of enumerated factors by the Parole Board. Code § 53.1-155; Virginia Parole Board, Policy Manual, Section I (2006), available at https://vpb.virginia.gov/files/1107/vpb-policy-manual.pdf (last visited Dec. 1, 2016). While maturity and rehabilitation are not factors which are enumerated verbatim, they are substantially present. *See id.* However, geriatric release applicants are required to cite compelling reasons for their release, and the Parole Board can deny the application for any reason upon Initial Review.[4] Virginia Parole Board Admin. Proc. 1.226.[5] No consideration of particular factors is required. *Id.* If geriatric release as implemented in Virginia carries no mandate to ensure a process for

---

[3] Traditional parole, while still operational, applies to sentences rendered in prosecutions for crimes that were committed prior to January 1, 1995. Code § 53.1-165.1.

[4] Applications that proceed past the Initial Review stage to the Assessment Review stage receive consideration under the same factors as those eligible for traditional parole. Virginia Parole Board Admin. Proc. 1.226.

[5] As of December 1, 2016, the Virginia Parole Board Administrative Procedure Manual was available at https://vpb.virginia.gov/files/1108/vpb-procedure-manual.pdf.

consideration of maturation or rehabilitation, it would appear to fail the test set forth in *Graham* that release be "based on demonstrated maturity and rehabilitation." 560 U.S. at 75. *See also LeBlanc v. Mathena*, No. 15-7151, 2016 U.S. App. LEXIS 20041, at *25-31 (4th Cir. Nov. 7, 2016) (holding Virginia's geriatric release statute failed to provide a meaningful opportunity for release based on maturity and rehabilitation under *Graham* in accordance with the Eighth Amendment). In this regard, it is also manifest that geriatric release is not a meaningful opportunity for release that is "akin to parole."

Additionally, following *Miller* and *Montgomery*, the issue of rarity is no longer a mere empirical observation; it is instead linked to a substantive element: "Although *Miller* did not foreclose a sentencer's ability to impose life without parole on a juvenile, the Court explained that a lifetime in prison is a disproportionate sentence for all but the rarest of children, those whose crimes reflect irreparable corruption." *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 726 (citation and internal quotation marks omitted). Yet if geriatric release does not require consideration of irreparable corruption versus demonstrated maturity, or ensure that denial of release, and therefore life without parole, is indeed rare, then we cannot claim geriatric release serves as a basis for the validation of life without parole sentences without complying with the framework of *Montgomery*.

In requiring that "sentencing courts consider a child's 'diminished culpability and heightened capacity for change' before condemning him to die in prison," *Graham*, *Miller,* and *Montgomery* now reflect an evident clarification of doctrine on the part of the Supreme Court of the United States to avoid condemning juveniles to life in prison without hope of parole due to the "transient immaturity of youth." *Montgomery*, 577 U.S. at ___, ___, 136 S. Ct. at 726, 734. As *Miller* emphasizes, "removing youth from the balance . . . contravenes *Graham's* (and also

17

*Roper's*) foundational principle:  that imposition of a State's most severe penalties on juvenile offenders cannot proceed as though they were not children."  567 U.S. at ___, 132 S. Ct. at 2466. Yet geriatric release treats juveniles no differently than adults, and is if anything harsher due to the longer period of punishment the juvenile must serve before reaching the age of eligibility.

In light of recent Supreme Court precedent, I believe that the juveniles sentenced to life in Virginia are no different than the juveniles sentenced to "life imprisonment without parole" described in *Graham*, *Miller,* and *Montgomery*, and that geriatric parole does not provide a "meaningful opportunity to obtain release based on demonstrated maturity and rehabilitation." *Graham*, 560 U.S. at 75.  As a result, juveniles sentenced to life in Virginia are in fact facing "the harshest possible penalty for juveniles," *Miller*, 567 U.S. at ___, 132 S. Ct. at 2475, regardless of whether we choose to invoke the phrase "life without parole."  Accordingly, they should be protected by the substantive and, at least prospectively, procedural rules of law clarified in *Montgomery*.[6]

### III.

In the case at bar, the record reflects that the trial court considered peer-reviewed journals presented by the defendant concerning adolescent brain development and legal culpability, thereby considering "youth and its attendant characteristics" before rendering its sentence. *Montgomery*, 577 U.S. at ___, 136 S. Ct. at 735.  Because I believe the trial court satisfied the constitutional requirements articulated in *Miller* and *Montgomery*, I concur in the majority's opinion affirming Johnson's sentence.

---

[6] As stated in *Montgomery*, I do not believe this disturbs the finality of sentences:  rather, retroactively, the Commonwealth must ensure that the geriatric release procedures are modified or another review is put in place for juveniles after a term of years that comports with the requirements set forth in *Graham*, *Miller*, and *Montgomery*.

18