COURT OF APPEALS OF VIRGINIA

PUBLISHED

Present:   Judges Raphael, White and Senior Judge Petty
Argued at Richmond, Virginia


JEFFREY DOUGLAS CHERIPKA

OPINION BY
v.      Record No. 1153-22-2            JUDGE WILLIAM G. PETTY
SEPTEMBER 19, 2023

COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF FLUVANNA COUNTY
Richard E. Moore, Judge

Bryan Jones (Bryan J. Jones, LLC, on briefs), for appellant.

Craig W. Stallard, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


A jury convicted Jeffrey Douglas Cheripka of two counts of object sexual penetration of a

child under the age of 13.  Consistent with the jury's verdict, the trial court sentenced him to the

mandatory minimum of life imprisonment for each charge.  On appeal, Cheripka argues that the

trial court abused its discretion in several evidentiary rulings, by prohibiting his access to the

internet to prepare for trial, and by giving a jury instruction on his alleged flight.  He also argues that

the mandatory life sentences were unconstitutional and that the trial court erred by denying his

request for a pre-sentence report.  Finding no reversible error, we affirm the trial court's judgment.

BACKGROUND

On appeal, we recite the facts "in the 'light most favorable' to the Commonwealth, the

prevailing party in the trial court." *Hammer v. Commonwealth*, 74 Va. App. 225, 231 (2022)

(quoting *Commonwealth v. Cady*, 300 Va. 325, 329 (2021)).  Doing so requires us to "discard the

evidence of the accused in conflict with that of the Commonwealth, and regard as true all the

credible evidence favorable to the Commonwealth and all fair inferences to be drawn therefrom."
*Cady*, 300 Va. at 329 (quoting *Commonwealth v. Perkins*, 295 Va. 323, 324 (2018)).

Cheripka and his wife, Melanie Cheripka, married in 2011.  They had six children, including three from Melanie's previous relationship, whom Cheripka adopted.  Two of the adopted children, B.C. (the named victim in the indictments) and E.C., were six and three years old respectively when Cheripka and Melanie married.

When B.C. was eight years old and the family lived in Fredericksburg, Cheripka kissed her on the lips while they were in Cheripka and Melanie's bedroom.  B.C. was confused and did not know it was wrong because Cheripka told her that was what family members do.  In another incident, Cheripka again kissed B.C.'s lips when they were alone in the bedroom.  Cheripka then removed B.C.'s pants and inserted his fingers into her vagina, causing B.C. pain because of his long fingernails.  Cheripka repeatedly abused B.C. while the family lived in Fredericksburg and instructed her to wear dresses with no underwear so the abuse would be "easier" to hide if a family member unexpectedly entered the bedroom.

B.C. played soccer on a travel team, competing "all over" the east coast.  Cheripka usually accompanied B.C. on her soccer trips and sexually abused her in the family's minivan and in hotel rooms.  Cheripka also used food and other items to coerce B.C.'s participation in the abuse.  If B.C. asked to get food before or after a soccer game, Cheripka agreed only if she kissed him for five minutes or had sex with him.  Cheripka told B.C. that if she reported him, she and her siblings would go into foster care, she would go to jail, and he and Melanie would be arrested.  B.C. believed Cheripka and did not report the abuse.

In June 2017, the family moved to Fluvanna County.  At trial, B.C. testified regarding two specific instances of abuse that occurred in Fluvanna.  In the first incident, Cheripka pulled back the shower curtain while B.C. was in the shower, kissed her, and inserted his fingers into her vagina for

a few minutes. B.C. tried to resist, but it was "hard[] to fight" because the tub was slippery. The second incident B.C. recalled occurred in the master bedroom while Melanie was cooking. Cheripka pinned B.C. down on the bed with her arms above her head. B.C. asked him to stop and told him that he was hurting her. Cheripka called B.C. fragile and a "baby," kissed her, and put his fingers in her vagina. The incident ended when one of B.C.'s siblings came upstairs and said it was time for dinner. B.C. was twelve when each of those incidents occurred.

In April 2019, Melanie was in bed when B.C. came into her bedroom crying and shaking. B.C. was afraid to tell Melanie what was wrong and said that she was sorry. After approximately five minutes, B.C. told Melanie that Cheripka had been sexually abusing her and E.C. B.C. told Melanie the abuse began when she was eight but could not remember specific dates because it happened at least two or three times a week for a long period of time. Melanie wanted to call the police, but B.C. asked her to wait until after Easter on April 21, 2019, for the sake of her younger siblings. The following day, Melanie spoke with E.C., who provided a similar account.

On the afternoon of April 21, 2019, Cheripka left the house, and Melanie called the police. Officers drove to the house and waited until Cheripka returned. Cheripka spoke to the officers and did not deny the allegations. He also spoke with a Department of Social Services employee over the phone, who directed him to leave the house. Five days later, Cheripka admitted himself into a hospital in New Jersey. Cheripka's medical records demonstrated that while receiving mental health treatment, Cheripka admitted that he had sexually assaulted a child who was "a member of the family." A Fluvanna County Sheriff's Office investigator obtained and executed a search warrant for Cheripka's medical records.

A grand jury indicted Cheripka on two counts of object sexual penetration of B.C. While awaiting trial, Cheripka filed numerous *pro se* motions in the trial court. Relevant to this appeal, Cheripka sought to exclude E.C.'s testimony during his trial on the charges related to his abuse of

- 3 -

B.C. Cheripka argued that E.C.'s testimony constituted inadmissible prior bad acts evidence and its probative value was outweighed by its unfair prejudice. The trial court denied the motion, finding that the probative value of E.C.'s testimony was not outweighed by its prejudice. The trial court also found that E.C.'s testimony was admissible as evidence of a common plan or scheme and evidence of sexual abuse with a similarly situated child. Cheripka also requested that the trial court authorize him to access the internet from the jail in order to obtain allegedly exculpatory evidence. Citing public safety concerns and noting that Cheripka's appointed investigator or standby counsel had internet access, the court denied the request.

At trial, E.C. testified that Cheripka began sexually abusing her when she was eight years old. During the first incident, Cheripka kissed E.C. while they were in the laundry room. Cheripka assured E.C. that his actions were normal and kept kissing her. In another instance, Cheripka removed his pants and made E.C. sit on his lap. Cheripka's abuse of E.C. occurred at home, in the family minivan, and at soccer tournaments. When E.C. was nine, Cheripka began putting his fingers in her vagina. While traveling for soccer tournaments, Cheripka woke E.C. at night and tried to make her have sex with him. E.C. did not report the abuse because Cheripka told her they would go to jail if she did so.

Cheripka continued abusing E.C. after the family moved to Fluvanna, almost every other day. Eventually, Cheripka made E.C. take periodic pregnancy tests and told her that if she became pregnant, "he would punch the baby until it died." Cheripka brought E.C. to her doctor appointments and told her not to pull down her pants if she was asked. E.C. testified that Cheripka abused her while Melanie and the other kids were downstairs or otherwise distracted. If Cheripka heard anyone coming, he and E.C. would pretend that they were trying to scare them. E.C. stated that if she wanted food after a soccer game, Cheripka made her do something sexual to him in

- 4 -

exchange. E.C. did not discuss the abuse with B.C. until after B.C. reported Cheripka's actions to Melanie.

After the close of the evidence, Cheripka objected to Jury Instruction 6, which provided: "If a person leaves the place where a crime was committed to avoid prosecution, detection, apprehension, or arrest, this creates no presumption that the person is guilty of having committed the crime. However, it is a circumstance which you may consider along with the other evidence." Cheripka argued that he did not flee the scene of the offenses but voluntarily left the house after the social services representative instructed him to do so. Moreover, Cheripka asserted that he travelled to New Jersey to receive mental health treatment, not to flee. The trial court found that Cheripka's travel to New Jersey was a circumstance the jurors could consider and granted the instruction.

After argument by counsel, the jury convicted Cheripka of two counts of object sexual penetration. Although each conviction carried a mandatory minimum term of life imprisonment, the trial court continued the matter for a sentencing hearing so that Cheripka could file any post-trial motions. At the sentencing hearing, Cheripka requested for the first time a pre-sentence report and psychosexual evaluation. Cheripka argued that without those reports, the trial court was "only looking at one side" when sentencing him. The trial court denied Cheripka's request, finding that he had waived the preparation of those reports.

Cheripka also argued that the mandatory minimum terms of life imprisonment without parole sentences were unconstitutional. He maintained that the mandatory life sentences were disproportionate to his offenses and "cut[] off his right to counsel" because there was nothing for counsel to do or argue. The trial court found that the General Assembly had the authority to set the mandatory sentences and life imprisonment was not disproportionate to his offenses. The court also found that the sentences were not unconstitutional because Cheripka qualified for geriatric release. Finally, the trial court found that Cheripka's Sixth Amendment right to counsel was not violated by

- 5 -

the mandatory life sentences because Cheripka elected to proceed *pro se* despite having several attorneys appointed for him. Accordingly, the trial court sentenced Cheripka to two terms of life imprisonment. Cheripka appeals.

ANALYSIS

I. E.C.'s Testimony

Cheripka argues that the trial court abused its discretion by allowing E.C. to testify about alleged prior bad acts. He contends that E.C.'s testimony served no purpose other than to prove his propensity to commit sexual offenses. Continuing, he asserts that E.C.'s testimony did not corroborate B.C.'s testimony because the methods of the alleged abuse were "completely different." Cheripka acknowledges that testimony of prior acts of sexual abuse may be admissible when the acts are between a defendant and the same victim; but he contends such testimony is not admissible when the prior acts involved another victim. Finally, Cheripka asserts that allowing E.C.'s testimony was not harmless, despite the trial court's limiting instruction, because it was "so prejudicial it must have remained in the mind of the jury and influenced [the] verdict."

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." *Warnick v. Commonwealth*, 72 Va. App. 251, 263 (2020) (quoting *Amonett v. Commonwealth*, 70 Va. App. 1, 9 (2019)). Under that standard, a "trial judge's ruling will not be reversed simply because an appellate court disagrees." *Hicks v. Commonwealth*, 71 Va. App. 255, 275 (2019) (quoting *Campos v. Commonwealth*, 67 Va. App. 690, 702 (2017)). Rather, a reviewing court can conclude that "an abuse of discretion has occurred" only in cases in which "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)).

"[E]vidence of other crimes, wrongs, or acts is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). "The law is clear that evidence 'tend[ing] to show that the accused is guilty of other crimes and offenses at other times' is not admissible if 'offered *merely* to show [the accused's] propensity to commit' the charged crime." *Harvey v. Commonwealth*, 76 Va. App. 436, 475 (2023) (alterations in original) (emphasis added) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714-15 (2008)). "However, numerous exceptions to this rule authorize the admission of [prior] 'bad acts' evidence." *Id.* (alteration in original) (quoting *Ortiz*, 276 Va. at 714).

Relevant here, evidence of other crimes is admissible when it "'shows the conduct or attitude of the accused toward his victim[;]' . . . or shows motive, method, intent, plan or scheme, or any other relevant element of the offense on trial." *Ortiz*, 276 Va. at 714 (first alteration in original) (first quoting *Moore v. Commonwealth*, 222 Va. 72, 76 (1981); and then citing *Scott v. Commonwealth*, 228 Va. 519, 527 (1984)). The admissibility of relevant evidence is also subject to the requirement that its "legitimate probative value . . . outweighs its incidental prejudice." *Harvey*, 76 Va. App. at 479 (quoting *Kenner v. Commonwealth*, 299 Va. 414, 427 (2021)). "The trial court is charged with balancing prejudicial impact and probative value[,] and the court's decision is subject to reversal only for an abuse of discretion." *Shifflett v. Commonwealth*, 29 Va. App. 521, 529 (1999) (citing *Pavlick v. Commonwealth*, 27 Va. App. 219, 226 (1998) (en banc)).

The Supreme Court has held repeatedly that "in a prosecution for incest, evidence of acts of incestuous intercourse between the parties . . . , whether prior or subsequent thereto, is, if not too remote in point of time, admissible" to demonstrate "the relations of the parties and the incestuous disposition of the defendant toward the other party." *Moore*, 222 Va. at 77 (quoting *Brown v. Commonwealth*, 208 Va. 512, 516-17 (1968)); *Ortiz*, 276 Va. at 714-15. Even when the prior sexual abuse was committed against *another victim*, evidence of the abuse may be admissible to

- 7 -

demonstrate a defendant's common motive, method, plan, or scheme, particularly "in prosecutions for crime involving a depraved sexual instinct. . . . Acts showing a perverted sexual instinct are circumstances which with other circumstances may have a tendency to connect an accused with a crime of that character." *Commonwealth v. Minor*, 267 Va. 166, 176 (2004) (quoting *Lovely v. United States*, 169 F.2d 386, 390 (4th Cir. 1948)); *see also Blankenship v. Commonwealth*, 69 Va. App. 692, 702 (2019) (affirming trial court's decision admitting evidence of defendant's prior felony conviction involving different victim where "both cases involved appellant exposing himself to the minor child of an acquaintance, and in both cases he used a vehicle to facilitate the offense. In each case, the female victim was significantly younger than appellant and was dependent on appellant for transportation . . . .").

That rationale for admitting the evidence applies with equal force in a circumstance where, as here, a defendant is prosecuted for incest against two daughters of similar age living in the same household. When the two daughters provide substantially similar testimony that describes the defendant's same pattern of abuse, each daughter's testimony has significant probative value of demonstrating the defendant's incestuous disposition toward his daughters and that his offenses against both were "inspired by one purpose." *Moore*, 222 Va. at 77 (quoting *Brown*, 208 Va. at 517).

Here, E.C.'s testimony describing Cheripka's sexual abuse was highly probative of the nature of Cheripka's relationship with both B.C. and E.C. and established the parallel conduct of his abuse with both girls. B.C. and E.C. were siblings in the same household and close in age. Both testified that Cheripka began abusing them when they were eight years old, demonstrating that he was sexually attracted to children of that age. Cheripka employed the same method of abuse with B.C. and E.C., beginning by kissing them on their lips and assuring them—falsely—that his actions were normal. Then Cheripka digitally penetrated their vaginas. Cheripka abused both girls by

ensuring Melanie and the other children were distracted during the abuse, or by abusing them while travelling for soccer. He concocted elaborate schemes to hide the abuse. Cheripka also withheld food from both girls to coerce their participation in sexual acts. Thus, E.C.'s testimony was not offered merely to demonstrate Cheripka's propensity to commit the charged crime. The testimony highlighting Cheripka's parallel conduct with both girls was highly probative of the common scheme and method he employed to abuse B.C. We see no principled reason why we should not apply the Supreme Court's holding in *Ortiz* to the facts of a case such as this.

The trial court also reasonably concluded that the significant probative value of E.C.'s testimony outweighed its prejudicial effect. *Conley v. Commonwealth*, 74 Va. App. 658, 672-73 (2022); *Blankenship*, 69 Va. App. at 702-03. We presume the jury followed the trial court's limiting instruction. *Muhammad v. Commonwealth*, 269 Va. 451, 524 (2005). It is elementary that all "evidence tending to prove guilt is prejudicial to an accused, but the mere fact that such evidence is powerful . . . does not thereby render it inadmissible." *Powell v. Commonwealth*, 267 Va. 107, 141 (2004). The record demonstrates that the trial court instructed the jury that it could consider E.C.'s testimony "only as evidence of [Cheripka's] motive or intent or as evidence of [his] scheme or plan as evidenced by his conduct and feelings toward the victim." "Virginia law, however, intervenes only when the alleged prejudice tends to inflame irrational emotions or leads to illegitimate inferences. And even then, it becomes a matter of degree." *Thomas v. Commonwealth*, 44 Va. App. 741, 758, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005); *cf. United States v. Ebert*, 61 F.4th 394 (4th Cir. 2003). Here, the significant probative value of E.C.'s testimony outlined above, far outweighed any prejudice and any prejudice was ameliorated by the judge's instruction to the jury. Accordingly, the trial court did not abuse its discretion by allowing E.C. to testify.

## II. Medical Records

Before trial, Cheripka moved to exclude from the evidence his medical records from the hospital in New Jersey that contained his admission that he had sexually assaulted a child who was "a member of the family." He argued that admitting the records would violate his right to confront his accusers. The trial court denied the motion, finding that the statements were not testimonial because he was at the hospital seeking treatment. On appeal, Cheripka argues that the trial court erred by admitting his medical records because the statements of his treatment providers in the records were testimonial. He asserts that because the police were investigating him while he was at the hospital, he was "experiencing the equivalent of a custodial interrogation at the time he made the statements."

"Although we will not disturb on appeal decisions regarding the admissibility of evidence absent an abuse of the trial court's discretion, we review *de novo* whether a particular category of proffered evidence is 'testimonial hearsay.'" *Canada v. Commonwealth*, 75 Va. App. 367, 381 (2022) (quoting *Holloman v. Commonwealth*, 65 Va. App. 147, 170 (2015)). The Confrontation Clause demands that a criminal defendant "be confronted with the witnesses against him." U.S. Const. amend. VI. Witnesses are those who "bear testimony" and "'[t]estimony,' in turn, is typically '[a] solemn declaration or affirmation made for the purpose of establishing or proving some fact.'" *Crawford v. Washington*, 541 U.S. 36, 51 (2004) (quoting 2 N. Webster, *An American Dictionary of the English Language* (1828)). Thus, the Confrontation Clause prohibits the prosecution from introducing "testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Id.* at 53-54.

A statement qualifies as testimonial when the "'primary purpose' of the [statement] was to 'creat[e] an out-of-court substitute for trial testimony.'" *Ohio v. Clark*, 576 U.S. 237, 245 (2015)

- 10 -

(second alteration in original) (quoting *Michigan v. Bryant*, 562 U.S. 344, 358 (2011)).  A testimonial statement is "functionally identical to live, in-court testimony, doing 'precisely what a witness does on direct examination.'"  *Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009) (quoting *Davis v. Washington*, 547 U.S. 813, 830 (2006)).  "[A] statement cannot fall within the Confrontation Clause unless its *primary* purpose was testimonial."  *Cody v. Commonwealth*, 68 Va. App. 638, 658 (2018) (alteration in original) (quoting *Clark*, 576 U.S. at 246).

"In determining whether a statement is testimonial, courts ask 'whether, in light of all the circumstances, viewed objectively, the "primary purpose" of [the statement] was to "creat[e] an out-of-court substitute for trial testimony,"'" at the time the statement was made, not trial.  *Logan v. Commonwealth*, 299 Va. 741, 745-46 (2021) (alterations in original) (quoting *Clark*, 576 U.S. at 245).  "[T]he relevant inquiry is not the subjective or actual purpose of the individuals involved in a particular encounter, but rather the purpose that reasonable participants would have had, as ascertained from the individuals' statements and actions and the circumstances in which the encounter occurred."  *Bryant*, 562 U.S. at 360.  "Where no such primary purpose exists, the admissibility of a statement is the concern of [the] . . . rules of evidence."  *Id.* at 359.  "In the end, the question is whether, in light of all the circumstances, viewed objectively, the 'primary purpose' of the [statement] was to 'creat[e] an out-of-court substitute for trial testimony.'"  *Clark*, 576 U.S. at 245 (second alteration in original) (quoting *Bryant*, 562 U.S. at 358).

"'[M]edical reports created for treatment purposes' are nontestimonial."  *Sanders v. Commonwealth*, 282 Va. 154, 164 (2011) (quoting *Melendez-Diaz*, 557 U.S. at 312 n.2).  Viewed objectively, the circumstances surrounding the challenged records demonstrated that Cheripka was seeking medical treatment.  The statements contained in these records were made during Cheripka's treatment for his suicidal ideation.  The records themselves indicated that Cheripka believed the nature of the communications were confidential and protected by HIPAA.  Thus, the

primary purpose of the statements was not to create an out-of-court substitute for trial testimony. Rather, the statements were made to properly document Cheripka's medical chart for his treatment. Accordingly, the statements in Cheripka's medical records were not testimonial, and the trial court did not abuse its discretion by admitting them.

### III. Internet Access

Before trial, Cheripka asked the trial court to allow him to access the internet to "try and receive defense information" and "print off other materials as part of [his] defense." Cheripka asserted that he needed internet access to retrieve exculpatory evidence from cloud storage. He also argued that his lack of internet access violated his First Amendment rights. Cheripka did not proffer what information was in the cloud storage, or what the nature of the purportedly exculpatory evidence was; he stated only that "they're documents." The trial court denied Cheripka's motion, finding that there was "nothing specific enough" for it to act upon. On appeal, Cheripka argues that the trial court erred and violated his constitutional rights by imposing a "blanket prohibition" on his internet access. He asserts that the prohibition on internet access violated his due process and First Amendment rights.

> When it plainly appears from the record and the evidence given at the trial that the parties have had a fair trial on the merits and substantial justice has been reached, no judgment shall be arrested or reversed . . . [f]or any other defect, imperfection, or omission in the record, or for *any error committed* on the trial.

Code § 8.01-678 (emphasis added). "Though sometimes thought of as a mere waiver principle, the proffer requirement serves the higher purpose of safeguarding our duty under Code § 8.01-678 to reverse *only when the trial court error actually prejudiced the defense*." *Ray v. Commonwealth*, 55 Va. App. 647, 650 (2010) (emphasis added) (citing *Kirby v. Commonwealth*, 50 Va. App. 691, 698-99 (2007)). Even errors "arising from the denial of a constitutional right are subject to a harmless error analysis." *Angel v. Commonwealth*, 281 Va. 248, 264 (2011)

- 12 -

(citing *Lilly v. Commonwealth*, 258 Va. 548, 551 (1999)). Thus, "[a]bsent a proffer showing 'harm was done,' we are 'forbidden to consider the question.'" *Ray*, 55 Va. App. at 650 (quoting *Scott v. Commonwealth*, 191 Va. 73, 78-79 (1950)).

The record demonstrates that Cheripka failed to provide any proffer—let alone an adequate one—of the information he sought to obtain from the internet. On this record, there is no basis for this Court to determine whether the trial court committed reversible error by denying him that access. At the hearing on his motion, Cheripka asserted merely that he needed to access the internet to obtain documents from cloud storage and "other websites" to impeach witnesses. He did not proffer what specific evidence he sought or how the evidence supported his defense. He asserted only that it "may be some letters and records and things" and was "exculpatory." When the trial court specifically asked what information Cheripka sought, he stated, "all I can say is they're documents . . . that would counter what [B.C.] was testifying [about]." Other than broadly claiming that the documents contained "letters and records and things," Cheripka never proffered as to what the documents were, or what information they would have contained. Without such a proffer from Cheripka, "we cannot competently determine error" and are "forbidden to consider the question." *Ray*, 55 Va. App. at 649-50 (first quoting *Tynes v. Commonwealth*, 49 Va. App. 17, 21 (2006); and then quoting *Scott*, 191 Va. at 79).[1]

_____

[1] In addition, although Cheripka proceeded *pro se* before the trial court, the trial court granted funds for him to hire a private investigator who, the court noted, could "look into the [i]nternet access issue" and "follow-up any leads." In addition, Cheripka did not proffer that he lacked access to a law library or otherwise needed internet access to conduct necessary legal research; rather, he consistently asserted only that he needed access to the internet to obtain unspecified "documents."

IV. Jury Instructions

Cheripka next argues that the trial court abused its discretion by giving the flight jury instruction. He asserts that the record is devoid of evidence that he fled the scene of the crime to avoid detection, apprehension, arrest, or criminal prosecution. Instead, he asserts that he left the house at the direction of the Department of Social Services and drove to New Jersey for medical treatment.

When reviewing jury instructions on appeal, it is this Court's "sole responsibility . . . to see that the law has been clearly stated and that the instructions cover all issues which the evidence fairly raises." *Cooper v. Commonwealth*, 277 Va. 377, 381 (2009) (quoting *Molina v. Commonwealth*, 272 Va. 666, 671 (2006)). A reviewing court must respect the trial court's "broad discretion in giving or denying instructions requested" and therefore reviews those decisions for an abuse of discretion. *Barney v. Commonwealth*, 69 Va. App. 604, 609 (2019) (quoting *Gaines v. Commonwealth*, 39 Va. App. 562, 568 (2003) (en banc)). "[J]ury instructions are proper only if supported by the evidence, and more than a scintilla of evidence is required." *Watson v. Commonwealth*, 298 Va. 197, 207 (2019) (quoting *Payne v. Commonwealth*, 292 Va. 855, 869 (2016)).

It is well-established that "[f]light following the commission of a crime is evidence of guilt, and the jury may be so instructed." *Ricks v. Commonwealth*, 39 Va. App. 330, 335 (2002) (quoting *Clagett v. Commonwealth*, 252 Va. 79, 93 (1996)). Nevertheless, "to show a 'consciousness of guilt,'" the evidence must demonstrate a "nexus" between the flight and the alleged offense. *Id.* (citing *Jarrell v. Commonwealth*, 132 Va. 551, 569 (1922)). Multiple potential causes for a defendant's flight, including other offenses unrelated to the charged offense, do not undermine the nexus of the flight to the charged offense. *Id.* at 336. Instead,

such circumstances are properly submitted to and weighed by the jury. *See generally id.* at 337-38.

The record contains more than a scintilla of evidence from which the jury could have concluded that Cheripka travelled to New Jersey to avoid detection, apprehension, arrest, or prosecution. Cheripka did not merely leave the family home after speaking to the Department of Social Services. Within five days of leaving the home, he travelled out of the state and checked into a hospital in New Jersey. Cheripka knew the police were investigating him for the abuse of B.C. No evidence demonstrated that he could not seek treatment within the Commonwealth, a circumstance from which a rational factfinder could conclude he sought to distance himself from apprehension. Additionally, Cheripka's medical records indicate that he did not want the providers to call his wife and believed his communications were confidential and protected by HIPAA. The medical records also indicated that "everything seemed normal" when Cheripka's mother saw him for Easter, but "a couple days later," he wanted to go to New Jersey. The flight instruction covered an issue fairly raised by the evidence; thus, the trial court was within the bounds of its discretion in reading it to the jury.

## V. Psychosexual Evaluation and Presentence Report

Cheripka argues that the trial court erred in denying his request for a psychosexual evaluation and presentence report. He asserts that he did not waive his rights to either report because there was no discussion on the record regarding the reports until he first asked for them at the sentencing hearing. Accordingly, he asks this Court to remand the matter for a new sentencing hearing.

Code § 19.2-299(A)(iii) requires a trial court to order a presentence investigation report when a person is convicted of object sexual penetration under Code § 18.2-67.2. The presentence report is designed to "fully advise the court" regarding the defendant's history "so

the court may *determine the appropriate sentence to be imposed*." Code § 19.2-299(A)

(emphasis added). Similarly, when a defendant is convicted of an offense indicative of "sexual

abnormality," the trial court must defer sentencing until a report of a mental examination "can be

secured to guide the judge in determining *what disposition shall be made* of the defendant."

Code § 19.2-300 (emphasis added).

We need not address whether the trial court erred by denying Cheripka's request for a

presentence report and psychosexual evaluation under the above statutes because any such error

was harmless in this case. Unless otherwise provided by statute, Code § 8.01-678 requires a

harmless error review in all cases. *Commonwealth v. White*, 293 Va. 411, 420 (2017).

Presentence reports and psychosexual evaluations are explicitly intended to assist the trial court

in determining the appropriate sentence and disposition of cases. Code §§ 19.2-299(A),

19.2-300; *Duncan v. Commonwealth*, 2 Va. App. 342, 345 (1986) ("The presentence report

generally provides the court with mitigating evidence."), *superseded in part by statute*, Code

§ 19.2-295.2.

In this case, Cheripka's convictions for object sexual penetration of a victim under the

age of 13 carried mandatory minimum terms of life imprisonment. Code § 18.2-67.2.[2] Thus, the

trial court was obligated to impose life imprisonment for each conviction regardless of what the

presentence report and psychosexual evaluation revealed. *Commonwealth v. Greer*, 63 Va. App.

561, 573 (2014) (holding that a "trial court's authority to depart downward below a mandatory

minimum is 'nonexistent'" (quoting *Lilly v. Commonwealth*, 50 Va. App. 173, 187-88 (2007))).

Accordingly, any error by denying Cheripka's request for those reports was harmless under the

circumstances, and a remand is unnecessary because a new hearing would yield the same

---

[2] Not all offenses under Code § 18.2-67.2 carry a mandatory minimum term of life
imprisonment.

sentences. *See County of Amherst v. Brockman*, 224 Va. 391, 396 (1982) (holding that the law does not require the performance of "a meaningless act").

## VI. Mandatory Life Sentences

Finally, Cheripka argues that the trial court erred when it found the mandatory life sentences were constitutional. He asserts that the mandatory life sentences were grossly disproportionate to his crimes, arguing that he was a first-time offender with no criminal record. He also argues that the mandatory sentences violated his Sixth Amendment right to counsel because although represented, his attorney could do nothing to change the mandatory sentences.

"The Eighth Amendment, which forbids cruel and unusual punishments, contains a 'narrow proportionality principle' that 'applies to noncapital sentences.'" *Ewing v. California*, 538 U.S. 11, 20 (2003) (quoting *Harmelin v. Michigan*, 501 U.S. 957, 996-97 (1991)). The United States Supreme Court "'has on occasion stated that the Eighth Amendment prohibits imposition of a sentence that is grossly disproportionate to the severity of the crime.' But '[o]utside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare.'" *Id.* at 21 (alteration in original) (quoting *Rummel v. Estelle*, 445 U.S. 263, 272 (1980)). "Reviewing courts, of course, should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." *Solem v. Helm*, 463 U.S. 277, 290 (1983). "Our traditional deference to legislative policy choices finds a corollary in the principle that the Constitution 'does not mandate adoption of any one penological theory.'" *Ewing*, 538 U.S. at 25 (quoting *Harmelin*, 501 U.S. at 999).

To the extent that Cheripka argues that his sentences were disproportionate, the Court declines to engage in a proportionality review in cases that do not involve life sentences without

the possibility of parole. *Cole v. Commonwealth*, 58 Va. App. 642, 654 (2011). "[T]he possibility of geriatric release under Code § 53.1-40.01 provides a meaningful opportunity for release that is akin to parole." *Johnson v. Commonwealth*, 292 Va. 772, 781 (2016) (citing *Angel*, 281 Va. at 275). Cheripka's convictions were not Class 1 felonies, so he will be eligible for geriatric release under Code § 53.1-40.01. Therefore, "it is readily apparent that . . . [Cheripka] was only sentenced to life in prison; he was not sentenced to life without parole." *Id.* Thus, we decline to conduct a proportionality review in this case. *Cole*, 58 Va. App. at 654.

Cheripka also argues that the mandatory sentences deprived him of counsel who could advocate on his behalf. Cheripka asserts the sentencing hearing "lost any character of a confrontation of adversaries because [he] could do nothing to change the mandatory life sentence[s]."

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence." U.S. Const. amend. VI. This right extends to sentencing. *Mempa v. Rhay*, 389 U.S. 128, 136-37 (1967). "[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" *United States v. Cronic*, 466 U.S. 648, 656 (1984) (quoting *Anders v. California*, 386 U.S. 738 (1967)). "The right to the effective assistance of counsel is thus the right of the accused to require the prosecution's case to survive the crucible of meaningful adversarial testing." *Id.* "[I]f the process loses its character as a confrontation between adversaries, the constitutional guarantee is violated." *Id.* at 656-57.

The record does not support Cheripka's conclusion that counsel was unable to advocate for him. The trial court appointed Cheripka's standby counsel for the sentencing phase of the trial. At the sentencing hearing, Cheripka's counsel argued that the mandatory life sentences were unconstitutional and requested a continuance. Counsel answered the trial court's questions

and also responded to the Commonwealth's argument.  Cheripka's counsel also cross-examined one of the Commonwealth's witnesses.  Cheripka's counsel also discussed that sentencing guidelines would have recommended a ten-year sentence if the life sentences were not mandatory.

Thus, the record demonstrates that despite the predetermined sentences, Cheripka's counsel challenged the validity of the mandatory sentences, argued that the sentences should not have been imposed, addressed the Commonwealth's arguments, and cross-examined a witness. Indeed, counsel's actions during the sentencing hearing preserved Cheripka's arguments for appeal.  Thus, Cheripka's Sixth Amendment right to counsel was fully vindicated at the sentencing hearing.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*